890 F.2d 628
 Fed. Sec. L. Rep. P 94,805, 15 Fed.R.Serv.3d 948
 In re CRAFTMATIC SECURITIES LITIGATION, John P. Decker,
Philip Cohen and David J. Steinberg, Appellants,
v.
Stanley KRAFTSOW, Carolyn Kraftsow, Craftmatic/Contour
Industries, Inc., Advest, Inc., Appellees.
 No. 89-1192.
 United States Court of Appeals,
Third Circuit.
 Argued July 20, 1989.
Decided Nov. 29, 1989.
As Amended Jan. 30, 1990.
 
 Gerald J. Rodos (argued), Barrack, Rodos & Bacine, Bernard M. Gross, Deborah R. Gross, Gross, Sklar & Metzger, Philadelphia, Pa., Richard D. Greenfield, Brenda M. Nelson, Greenfield & Chimicles, Haverford, Pa., David H. Weinstein, Stuart H. Savett, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for appellants.
 Steven R. Waxman (argued), Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for appellee, Advest, Inc.
 Alan C. Kessler (argued), Richard M. Meltzer, Mark R. Rosen, Lisa Ehrich, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for appellees, Stanley Kraftsow, Carolyn Kraftsow and Craftmatic/Contour Industries, Inc.
 Before STAPLETON, SCIRICA and WEIS, Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 This is an appeal from dismissal of a consolidated class action complaint brought under various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. The district court dismissed the securities law claims under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, and for failure to comply with the requirement of pleading fraud with particularity under Fed.R.Civ.P. 9(b). The district court also dismissed a claim of common law fraud and deceit for lack of pendent jurisdiction. 703 F.Supp. 1175, 1184 (E.D.Pa.1989).
 
 
 2
 The complaint made several allegations of omissions and misrepresentations, all of which the district court examined with care and we will affirm much of its judgment. However, because we believe that certain allegations should not be dismissed and that Collins v. Signetics Corp., 605 F.2d 110 (3d Cir.1979), relied upon by the district court, has now been implicitly overruled by the Supreme Court, we will reverse part of the district court's judgment.
 
 I.
 
 3
 Defendant Craftmatic/Contours Industries, Inc. is a company engaged in the business of marketing and selling a number of products, including the Craftmatic Adjustable Bed and the Contour Chair Lounge, through a network of independent distributors and the company's own direct sale operations. Defendant Stanley Kraftsow was the company's Chairman of the Board of Directors, President, and Chief Operating Officer, while his wife, Carolyn Kraftsow, was Secretary and a director.[1] Defendant Advest is a securities brokerage and investment firm. In the mid-1980s, Craftmatic grew significantly, expanding from total assets of four million dollars in 1984 to nineteen million dollars in 1986. Plaintiffs attribute Craftmatic's growth to the acquisition in September 1983 of Contour Chair Lounge, Inc., a previously unaffiliated concern, and to a vastly expanded marketing effort resulting in increased sales.
 
 
 4
 On March 5, 1986, an Initial Public Offering of 1,650,000 shares of Craftmatic Common Stock was made at $8.50 per share representing nearly 40% of the company's outstanding common shares. The Offering consisted of 1,000,000 shares issued and sold by Craftmatic, and an additional 650,000 shares sold by Stanley Kraftsow as the selling stockholder. Defendant Advest served as Craftmatic's investment banker, adviser, and principal underwriter for the Initial Public Offering. Plaintiffs allege that Craftmatic received in excess of seven and one half million dollars from the stock sale, and that Stanley Kraftsow received in excess of five million dollars.
 
 
 5
 The prospectus for the offering provided not only raw financial data, but also the following representations: 1) the company had embarked on an expansion program that could include acquisitions in the water purification and window shutter markets; 2) Craftmatic had signed a consent order with the Federal Trade Commission, as well as assurances of voluntary compliance with the State of Florida and the Commonwealth of Pennsylvania; and 3) Craftmatic believed it was "presently in compliance with consumer protection requirements."[2]
 
 
 6
 In 1987, Craftmatic sustained a loss of more than three million dollars, a decrease of 14.7% in wholesale sales and advertising commissions, and heavy losses in the two new product lines. In addition, the company entered into consent agreements with the states of Washington, Oregon, and Pennsylvania regarding its consumer sales practices in those states.
 
 
 7
 The thrust of plaintiffs' action is set forth in their brief: "As detailed in the Complaint, the serious operational problems known to defendants caused their statements concerning Craftmatic's marketing, expansion, and upgrading programs to be false and misleading...." According to plaintiffs, "the unexpected revelation of these adverse facts concerning Craftmatic's business, expansion, and profitability caused the price of its stock to plummet from the Initial Public Offering price of $8.50 per share to as low as $1 per share."
 
 
 8
 The Plaintiff class is comprised of all persons who purchased Craftmatic Common Stock during the period from March 5, 1986 through June 11, 1987. The First Consolidated Amended Complaint ("the Complaint") alleges four causes of action against the Craftmatic defendants. Count I alleges a violation of Sec. 11(a) of the Securities Act of 1933, 15 U.S.C. Sec. 77k(a) (1988).[3] Count II alleges a violation of Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1988), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1988).[4] Count III alleges a violation of Sec. 12(2) of the Securities Act, 15 U.S.C. Sec. 77l (2) (1988). Count IV alleges common law fraud and deceit. Additionally, plaintiffs allege "controlling person" liability against Stanley and Carolyn Kraftsow under Sec. 15 of the Securities Act, 15 U.S.C. Sec. 77o (1988), with regard to the Securities Act claims (Counts I and III), and under Sec. 20(a) of the Exchange Act, 15 U.S.C. Sec. 78t (1988), with regard to the Sec. 10(b) claim. Counts I and III are also alleged against Advest.
 
 
 9
 The factual allegations upon which these claims are based are contained in Paragraph 49 of the Complaint.[5] With the exception of the allegation contained in Subparagraph 49(n), each of the factual recitations is styled as a "failure to disclose" material information, rather than as an affirmative misrepresentation by the defendants.
 
 
 10
 The Craftmatic defendants moved to dismiss Counts I through III for failure to state a claim upon which relief can be granted (Fed.R.Civ.P. 12(b)(6)), to dismiss Count IV for lack of subject matter jurisdiction, and to dismiss all fraud claims for failure to plead with particularity (Fed.R.Civ.P. 9(b)). In the alternative, the Craftmatic defendants moved to strike the averments of the Complaint as legally insufficient (Fed.R.Civ.P. 12(f)). Simultaneously, Advest filed its own motion to dismiss for failure to state a claim upon which relief can be granted and, in the alternative, for a more definite statement of Count III (Fed.R.Civ.P. 12(e)).
 
 
 11
 In its Amended Order dated January 27, 1989, the district court dismissed the following federal claims:
 
 
 12
 1) Count I with respect to all the defendants for failure to state a claim upon which relief can be granted;2) Count III with respect to the Craftmatic defendants for failure to state a claim upon which relief can be granted;
 
 
 13
 3) Count II with respect to the Craftmatic defendants for failure to state a claim upon which relief can be granted to the extent it incorporated Paragraph 49(a)-(n), and (p) of the Complaint;
 
 
 14
 4) Count III with respect to Advest for failure to state a claim upon which relief can be granted to the extent it incorporated Paragraph 49(a)-(n), and (p) of the Complaint; and
 
 
 15
 5) Counts II and III with leave to amend, "for failure to comply with the 'particularity' requirement of Fed.R.Civ.P. 9(b)" to the extent they incorporated Paragraph 49(q)-(t) of the Complaint.
 
 
 16
 This left Subparagraph 49(o ). In the course of litigating a Motion to Reconsider, plaintiffs admitted that Subparagraph 49(o ), standing alone, did not fulfill the materiality requirement of Sec. 10(b) or Rule 10b-5, thus leaving no factual allegation to support Count II. In addition, they elected not to replead Subparagraphs 49(q)-(t), and they admitted Subparagraph 49(o ) did not constitute part of the claim against Advest under Sec. 12(2). Consequently, by Order dated February 10, 1989, the district court dismissed what was left of Counts II and III. As all of the federal question claims at that point were dismissed, the district court dismissed the common law claims in Count IV as well.
 
 
 17
 On appeal, plaintiffs essentially press four contentions. First, plaintiffs contend that the district court erred in holding that the Craftmatic defendants were not "sellers" subject to liability under Sec. 12(2) of the Securities Act. Second, plaintiffs maintain that the district court erred in ruling that certain subparagraphs allege only a failure to disclose mismanagement. Third, plaintiffs argue that the district court erred in ruling that certain allegedly undisclosed information amounted to no more than predictions of future business developments and that these omissions could not constitute a violation of federal securities laws. Finally, plaintiffs claim that the district court erred in ruling that certain allegations failed to meet the pleading requirements of Fed.R.Civ.P. 9(b).[6]
 
 
 18
 In reviewing a dismissal for failure to state a claim, we must accept the factual allegations as true and we may affirm the dismissal only if it appears certain that plaintiffs can prove no set of facts which would entitle them to relief. Ransom v. Marrazzo, 848 F.2d 398, 401 (3d. Cir.1988) (citing D.P. Enterprises, Inc. v. Bucks County Community College, 725 F.2d 943, 944 (3d Cir.1984)).
 
 II. Meaning of "Seller" Under Sec. 12(2)
 
 19
 Section 12(2) of the Securities Act provides that any person who offers or sells a security by means of a prospectus or oral communication that makes misstatements or omissions of material fact "shall be liable to the person purchasing such a security from him." 15 U.S.C. Sec. 77l (2) (1988). Relying on our decision in Collins v. Signetics Corp, 605 F.2d 110 (3d Cir.1979), the district court held that plaintiffs failed to state a claim against the Craftmatic defendants because under Collins, only the immediate seller of securities is liable to the purchaser for violations of Sec. 12(2). Consequently, the court dismissed Count III with respect to the Craftmatic defendants.
 
 
 20
 Since our decision in Collins, the Supreme Court in Pinter v. Dahl, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), has considered the scope of the term "seller" in the context of Sec. 12(1).[7] In Pinter, the Court stated that although "the language of Sec. 12(1) contemplates a buyer-seller relationship not unlike traditional contract privity," its scope is not limited to those who pass title. Id. 108 S.Ct. at 2076 (citing Sec. 2(3), Securities Act of 1933, 15 U.S.C. Sec. 77b(3) (1988) (definition of "sell" and "offer")). Therefore, because "solicitation is the stage at which an investor is most likely to be injured," id. at 2078, the Court held the term "seller" to include one "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Id. at 2079.
 
 
 21
 The Craftmatic defendants contend that the holding in Pinter is limited to Sec. 12(1) and should not be applied in this case. Examining the statute, we note that Sec. 12(1) and Sec. 12(2) use identical language to indicate the persons who may be held liable ("any person who ... offers or sells a security"), the persons who may sue ("the person purchasing such a security from him"), as well as the remedy available ("recover the consideration paid for such security ..., or ... damages if he no longer owns the security"). 15 U.S.C. Sec. 77l (1)-(2) (1988). Although the Pinter Court expressly declined to decide the scope of seller liability under Sec. 12(2), the Court recognized that the same language governs both sections and that most courts and commentators identify the same defendant class for each section. 108 S.Ct. at 2076 n. 20. Since Pinter, other courts of appeals have addressed this question and have concluded that the Pinter approach to Sec. 12(1) should be applied to Sec. 12(2). See Crawford v. Glenns, Inc., 876 F.2d 507, 510 (5th Cir.1989) (test for Sec. 12(2) status reformulated in light of Pinter ); Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d 1124, 1126 (2d Cir.1989) (we must consider implications of Pinter under Sec. 12(2)); Schlifke v. Seafirst Corp., 866 F.2d 935, 940 (7th Cir.1989) (Pinter undermines strict privity concept under Sec. 12(2)); Abell v. Potomac Insurance Co., 858 F.2d 1104, 1115 (5th Cir.1988) (Pinter Court interpreted Sec. 12(1) based on plain language and would presumably do the same with Sec. 12(2)), judgment vacated on other grounds, --- U.S. ----, 109 S.Ct. 3236, 106 L.Ed.2d 584, cert. denied, --- U.S. ----, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989); Capri v. Murphy, 856 F.2d 473, 478 (2d Cir.1988) (section 12(2) claim should be considered in light of Pinter ). Thus, given the identical language of sections 12(1) and 12(2), as well as the Securities Act's overall objective of disclosure,[8] we see no reason to distinguish the scope of "seller" for purposes of Sec. 12(1) and Sec. 12(2).[9]
 
 
 22
 In Pinter, after citing a number of authorities, including Collins, that limited Sec. 12 liability, the Court stated that "[w]e do not read Sec. 12(1) so restrictively." 108 S.Ct. at 2077. We adopt the Pinter analysis and hold that liability under Sec. 12(2) extends not only to those who pass title to the purchaser, but also to those who successfully solicit the purchase, motivated by their own or the securities owner's financial interests. See id. at 2079-80.
 
 
 23
 In evaluating whether participation falls within the scope of a Sec. 12 "seller," it is important to note that the term "solicitation" does not encompass all activities related to the purchase transaction. In Pinter, the Court stated that Congress did not intend to hold persons liable whose participation was "collateral to the offer or sale." Id. at 2080.[10] The Court rejected a test for "seller" that imposed liability on persons whose actions were merely a "substantial factor" in causing the purchase. Id. at 2080 & n. 25. Moreover, the language of Sec. 12, which makes a participant liable to the "person purchasing such a security from him ...," precludes actions against remote sellers, id. at 2077 n. 21, and focuses the inquiry on the relationship between the purchaser and the participant, rather than on the latter's degree of involvement in the transaction. See id. at 2081.
 
 
 24
 Thus, although an issuer is no longer immunized from Sec. 12 liability, neither is an issuer liable solely on the basis of its involvement in preparing the prospectus. The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a Sec. 12(2) seller. See Moore v. Kayport Package Express, Inc., 885 F.2d 531, 536-37 (9th Cir.1989) (mere performance of professional services without active solicitation of the purchase does not give rise to Sec. 12(2) liability); Wilson, 872 F.2d at 1127 (one who prepares documents for offering is Sec. 12(2) seller if commission was earned from actual seller for persuading client to make particular investment); Abell, 858 F.2d at 1114 & n. 8 (issuers are sellers to extent they utilize a system analogous to that of automobile manufacturers; that is, to the extent they create distribution chains and engage in intensive marketing to convince public to purchase their securities); Capri, 856 F.2d at 478-79 (defendant who played major role in setting up venture is not a Sec. 12(2) seller unless plaintiffs can show defendant actually solicited their investment); cf. id. at 477-78 (general partners in coal mining venture are liable as Sec. 12(2) sellers, even though they had no direct communication with investors, in light of district court finding that promoter acted only upon authorization of partners and that promotor was agent of partners).
 
 
 25
 Plaintiffs have also alleged that defendants "conspired with and aided and abetted one another" in violating Sec. 12(2). Prior to Pinter, we identified the elements necessary to sustain a charge of aiding and abetting securities violations. See Monsen v. Consolidated Dressed Beef Co., 579 F.2d 793, 799 (3d Cir.), cert. denied, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). Nonetheless, we did not specifically determine whether aider-abettor liability is appropriate under Sec. 12(2). See Collins, 605 F.2d at 114; see also Pinter, 108 S.Ct. at 2079 n. 24 (Collins left open whether aiding and abetting liability is available; we need not consider whether this theory is appropriate under Sec. 12(1) to decide Pinter ).
 
 
 26
 Since Pinter, two courts of appeals have declined to recognize a right of action for aiding and abetting under Sec. 12(2). See Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1017 (2d Cir.1989) (no separate aider and abettor liability under Sec. 12); Schlifke v. Seafirst Corp., 866 F.2d 935, 942 (7th Cir.1989) (we see no reason to imply a right of action for aiding and abetting under Sec. 12(2)). This view finds support in the language of Sec. 12(2), which expressly limits liability to those who offer or sell. Moreover, it would be anomalous to recognize aider and abettor liability in light of Pinter 's clear direction that Sec. 12(2) liability does not extend to collateral participants. Finally, as one court has noted, Sec. 12(2) provides for civil liability and a rescission remedy and, therefore, is not analogous to criminal or tort law, where aider and abettor liability has been recognized. Wilson, 872 F.2d at 1127. Thus, we hold that persons who fail to qualify as sellers under the Pinter standard may not be held liable under Sec. 12(2) on an aiding and abetting theory.
 
 
 27
 Applying these principles, we must determine whether the allegations in the complaint, if true, support plaintiffs' claim that the Craftmatic defendants were "sellers" within the meaning of Sec. 12(2). In Count III of their Complaint, plaintiffs allege that:
 
 
 28
 Each of the defendants ... either sold said securities directly to plaintiffs ... or solicited plaintiffs ... to buy Craftmatic common stock ... and in so acting were motivated by a desire to serve their own financial interests or the financial interests of the owner(s) of Craftmatic securities, and they ... conspired with and aided and abetted one another in connection with the preparation of the false and misleading Prospectus and Registration Statement used in conjunction with the sale of Craftmatic securities.
 
 
 29
 We find that plaintiffs' claim that the Craftmatic defendants were "sellers" for purposes of Sec. 12(2) is sufficient to survive a Rule 12(b)(6) motion to dismiss. It cannot be said at this juncture that plaintiffs can prove no set of facts that would entitle them to relief. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957); D.P. Enterprises, Inc. v. Bucks County Community College, 725 F.2d 943, 944 (3d Cir.1984). Therefore, to the extent that plaintiffs in all other respects have sufficiently alleged a violation of Sec. 12(2) against the Craftmatic defendants, they may maintain that action.
 
 III. Corporate Mismanagement
 
 30
 The district court dismissed Counts I-III, to the extent they incorporated Subparagraphs 49(a)-(c), (f), (h)-(n), after finding that these subparagraphs alleged only a failure to disclose ineffective management.[11] The district court relied on Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), in which the Supreme Court held that acts of corporate mismanagement do not violate Sec. 10(b) or Rule 10b-5 in the absence of deception, misrepresentation, or nondisclosure. Id. at 476, 479, 97 S.Ct. at 1302, 1304. Plaintiffs contend that the subparagraphs allege more than mere mismanagement. They argue that they have alleged failure to disclose material information about Craftmatic's operations and business prospects, and that Santa Fe does not preclude liability for nondisclosure of material facts merely because they also reflect mismanagement.
 
 
 31
 In Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court dismissed a Sec. 10(b) claim brought by minority shareholders involved in a Delaware short-form merger, who alleged that the price offered for their stock was based upon fraudulent valuations and that the majority shareholders failed to provide advance notice of the merger. Id. at 467, 474 n. 14, 97 S.Ct. at 1297-98, 1301 n. 14.[12] Noting that the conduct alleged did not fit within the meaning ascribed to "manipulation" under the statute, and that the shareholders had received the information necessary to decide whether to accept or reject the offered price, the Court held that the transaction, as alleged, was neither deceptive nor manipulative and, therefore, did not violate either Sec. 10(b) or Rule 10b-5. Id. at 474-77, 97 S.Ct. at 1301-03.[13] Moreover, the Court ruled that the failure to give advance notice was not a material omission because, under Delaware law, an appraisal proceeding is the sole remedy for any alleged unfairness in the merger. Thus, the shareholders had failed to show that they would have acted differently with prior notice of the merger. Id. at 474 n. 14, 97 S.Ct. at 1301 n. 14.
 
 
 32
 According to the Court, the fundamental purpose of the Securities Exchange Act is to implement "a philosophy of full disclosure;" once full and fair disclosure has occurred, the fairness of the terms of the transaction is beyond the scope of the Act. Id. at 477-78, 97 S.Ct. at 1303. Thus, a breach of fiduciary duty, unaccompanied by misrepresentation, nondisclosure, or deception, does not violate the statute or the Rule. Id. at 476, 97 S.Ct. at 1302. The Court concluded it would be inappropriate to federalize "corporate conduct traditionally left to state regulation," stating that Congress did not intend Sec. 10(b) to regulate "transactions which constitute no more than internal corporate mismanagement." Id. at 479, 97 S.Ct. at 1304 (quoting Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971)).[14]
 
 
 33
 Since Santa Fe, this and other courts have faced similar challenges to the adequacy of claims brought under the federal securities laws. In Biesenbach v. Guenther, 588 F.2d 400 (3d Cir.1978), we affirmed the dismissal of a Sec. 10(b) claim brought by minority shareholders, who claimed that the Board of Directors had misrepresented that certain loan transactions, from which the defendants stood to benefit, were in the best interests of the shareholders. Id. at 401. We stated that the failure to disclose the motive behind a director's decision is not actionable unless accompanied by objective and external deeds or omissions. Id. at 402. We concluded that "[i]n effect, appellants are stating that the failure to disclose the breach of fiduciary duty is a misrepresentation sufficient to constitute a violation of the Act. We refuse to adopt this approach, which would clearly circumvent the Supreme Court's holding in Santa Fe." Id. at 402.
 
 
 34
 Similarly, other courts have held that the securities laws do not obligate defendants to reveal the culpability of their activities or their impure motives for entering a transaction. See Panter v. Marshall Field & Co., 646 F.2d 271, 288 (7th Cir.) (shareholder cannot "bootstrap" breach of fiduciary duty claim into a Sec. 10(b) action by alleging nondisclosure of culpability), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). To that end, we must be alert to ensure that the purpose of Santa Fe is not undermined by "artful legal draftsmanship;" claims essentially grounded on corporate mismanagement are not cognizable under federal law. Id. at 289 (quoting Hundahl v. United Benefit Life Insurance Co., 465 F.Supp. 1349, 1359 (N.D.Tex.1979)).
 
 
 35
 Although allegations of failure to disclose mismanagement alone do not state a claim under federal securities law, a claim that defendants failed to disclose material facts may be actionable. In Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641 (3d Cir.1980), we emphasized the importance of distinguishing Santa Fe, in which the Court found no material misrepresentation or omission, from other cases in which the plaintiff alleges the omission of specific material facts. Id. at 646. Recognizing that Santa Fe cannot be read to stay our hand in remedying violations of federal law, we held that where a misrepresentation or omission of material information deprives a plaintiff of "an opportunity under state law to enjoin a merger, there is a cause of action under rule 10b-5." Id. at 646-47 (citing Goldberg v. Meridor, 567 F.2d 209, 218-21 (2d Cir.1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978)). We emphasized that the mere existence of a state remedy would be insufficient by itself to distinguish Santa Fe. The "crucial difference" is whether there was misrepresentation or omission in the flow of material information. Id. at 646-47; see Ray v. Karris, 780 F.2d 636, 642 (7th Cir.1985) (full disclosure policy of Act is implicated even in cases involving breach of fiduciary duty where deception serves to deprive a party of its preventive remedies under state law); Panter, 646 F.2d at 288 (requirement of deception is met when conduct includes omission of material fact); Goldberg, 567 F.2d at 217-18 (Santa Fe does not preclude Rule 10b-5 action when the alleged breach of fiduciary duty includes a material misrepresentation or nondisclosure).
 
 
 36
 An omitted fact is material if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The controversy in this case arises from a challenge by shareholders who purchased securities based on documents that allegedly misrepresented or omitted material information. Applying the TSC Industries standard, the question is whether it is substantially likely that omitted or misrepresented facts would have assumed actual significance to a reasonable investor contemplating the purchase of securities.
 
 
 37
 The line between a material nondisclosure and the nondisclosure of mere mismanagement is often difficult to draw. Arguably, any action amounting to corporate mismanagement would be material, that is, substantially likely to assume significance in the decisionmaking of the reasonable investor. However, courts have been reluctant to permit a federal securities claim to stand when the plaintiff has failed to allege more than nondisclosure of mismanagement, see Kas v. Financial General Bankshares, Inc., 796 F.2d 508, 513 (D.C.Cir.1986), and have posited different formulations to aid in distinguishing actionable from nonactionable omissions. See, e.g., Field v. Trump, 850 F.2d 938, 948 (2d Cir.1988) (disclosure is required where remedy is available to prevent irreparable injury from willful misconduct of a self-serving nature and nondisclosure will lull shareholders into foregoing remedy), cert. denied, --- U.S. ----, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); Kas, 796 F.2d at 513 (claim is not actionable under federal law if its validity rests solely on legal determination that transaction was unfair or that director breached fiduciary duty); Panter, 646 F.2d at 289 (after Santa Fe, claim is not cognizable under federal law if "central thrust" arises from act of corporate mismanagement).
 
 
 38
 The violation of federal law stems from the substantial likelihood that disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information" available, not from a determination that an undisclosed act constitutes a breach of fiduciary duty or that a transaction was unfair to investors. See TSC Industries, 426 U.S. at 449, 96 S.Ct. at 2132; Kas, 796 F.2d at 513. Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts.
 
 
 39
 In this case, the prospectus provided an accurate and reasonably detailed account of past operations and complete financial statements, and the concerns underlying the securities acts are not implicated simply because management has failed to characterize: 1) its new product research and other studies as meaningless, p 49(f); 2) itself as "unfocused" and "unable to manage" present businesses, p 49(i); 3) its costs as "out of control" and its cost controls as ineffective, p 49(j); 4) its financial reporting and accounting controls as inadequate and ineffective, p 49(k); and 5) its "information systems" as "wholly inadequate," p 49(l ). We therefore agree with the district court's dismissal of subparagraphs 49(f), (i), (j), (k), and (l ).
 
 
 40
 A quite different situation is presented, however, when the value of disclosure does not depend solely on whether there has been a breach of faith or ineptitude on the part of management. In this case, the prospectus attributed the company's past success primarily to its advertising, promotion, and marketing program and asserted three times that Craftmatic "and its distributors ... constitute the leading group engaged in direct in-home sales of adjustable beds and custom-fitted reclining chairs." Moreover, the prospectus stated that the company believed that "it is presently in compliance with consumer protection requirements." In this context, we believe the concerns of the securities acts are implicated by allegations that the prospectus failed to disclose facts material to the evaluation of the offered security such as: 1) the success of the advertising, promotion, and marketing program depended on deceptive, illegal practices, p 49(a)[15]; 2) the program violated various consumer protection laws and consent orders entered into between Craftmatic and federal and state governments, p 49(b), (c); 3) the program resulted in an abnormally high level of consumer complaints, p 49(h); and 4) despite its entry into consent orders resulting from the company's advertising and marketing activities, Craftmatic misrepresented its chairs as "custom-fitted," paragraphs 21, 49(n). If plaintiffs can prove these alleged facts, we believe a jury could conclude that the prospectus failed to disclose material facts necessary to make the disclosed material statements not misleading in violation of Sec. 11(a), Sec. 12(2), and Rule 10b-5. Accordingly, we will reverse the district court's dismissal with respect to subparagraphs 49(a), (b), (c), (h), and (n).[16]
 
 IV. Failure to Predict
 
 41
 The district court also dismissed plaintiffs' securities claims to the extent they relied on Subparagraphs 49(a), (d), (e), (g), (m), and (p). The court found that the alleged omissions outlined in these subparagraphs are immaterial as a matter of law because they call for speculation, would have provided only minimal aid--if any--to prospective shareholders, and seek to impose liability based upon defendants' failure to predict future business developments.
 
 
 42
 In their complaint, plaintiffs allege that defendants failed to disclose that:Craftmatic's advertising and marketing program was based on deceptive, illegal sales practices that "would and did result in serious charges being brought against Craftmatic ...," p 49(a);
 
 
 43
 "Craftmatic's rapid expansion program entailed an unusual and extremely high risk of failure ... and that ... the Company was essentially gambling with its profitability," p 49(d);
 
 
 44
 application of the advertising and marketing strategies to new product lines "would far outstrip the revenues generated ... and hurt the Company's profitability," p 49(e);
 
 
 45
 Craftmatic required an increasing number of distributorships in uncertain markets "without which Craftmatic's total net sales would stagnate or decline," p 49(g);
 
 
 46
 Craftmatic's rate of growth in its core business "was not sustainable," p 49(m);
 
 
 47
 Craftmatic's new products "were not amenable to being marketed successfully" by the sales methods developed for its core business, p 49(p).
 
 
 48
 Plaintiffs contend that the averments are not predictive but concern existing facts that defendants knew or should have known. Moreover, plaintiffs maintain that the district court erred in ruling on the materiality of the omissions in a Rule 12(b)(6) motion to dismiss, claiming that the determination of materiality should be left to the trier of fact.
 
 
 49
 Our analysis of plaintiffs' claims begins with two interrelated inquiries. First, were defendants under a duty to disclose the information at issue? Second, were the alleged omissions material? Staffin v. Greenberg, 672 F.2d 1196, 1202 (3d Cir.1982). In addition to the duty to disclose specific information required by law, sections 11(a) and 12(2), and Rule 10b-5 impose upon defendants the duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading. See 15 U.S.C. Secs. 77k, 77l, 78j (1982).[17] It is this duty that plaintiffs claim has been breached. Thus, our determination of the scope of defendants' disclosure duty is necessarily intertwined with an inquiry into the materiality of the alleged omissions.
 
 
 50
 As in our prior discussion, we turn to the Supreme Court's decision in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), in which the Court held that the issue of materiality is a mixed question of fact and law, involving the application of a legal standard to a specific set of facts. Id. at 450, 96 S.Ct. at 2133. Only when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law. Id.; Berg v. First American Bankshares, Inc., 796 F.2d 489, 495 (D.C.Cir.1986); see also Basic Inc. v. Levinson, 485 U.S. 224, 239, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988) (materiality of merger discussions assessed by factfinder). The Court defined materiality as follows:
 
 
 51
 An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.
 
 
 52
 426 U.S. at 449, 96 S.Ct. at 2132.[18] However, the Court cautioned:the disclosure policy embodied in the proxy regulations is not without limit.... Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good.... [I]f the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it to simply bury the shareholders in an avalanche of trivial information--a result that is hardly conducive to informed decisionmaking.
 
 
 53
 Id. at 448-49, 96 S.Ct. at 2132.
 
 
 54
 The task of determining whether a given omission is material is especially difficult when the plaintiff alleges nondisclosure of "soft" information. The term soft information refers to statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts. Hiler, The SEC and the Courts' Approach to Disclosure of Earnings Projections, Asset Appraisals, and Other Soft Information: Old Problems, Changing Views, 46 Md.L.Rev. 1114, 1116 (1987) (citing Kohn v. American Metal Climax, Inc., 458 F.2d 255, 265 (3d Cir.), cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972)).
 
 
 55
 Until the late 1970's, the SEC and the courts generally discouraged disclosure of soft information, on grounds that purchasers could be misled by overly optimistic claims and that soft information was neither reliable nor susceptible to SEC examination. In the late 1970's, however, SEC policy began to change as the agency recognized that its prohibition effectively kept valuable data from shareholders who were trying to decide whether to sell their securities. Flynn v. Bass Bros. Enterprises, 744 F.2d 978, 985-87 (3d Cir.1984). Today, the SEC encourages the disclosure of management's projections so long as the projections have a reasonable basis, are presented in an appropriate format, and are accompanied by disclosures that facilitate investor understanding. See 17 C.F.R. Sec. 229.10(b) (1988) (Commission policy on projections).[19]
 
 
 56
 In recent years, the Supreme Court and other courts have adopted a number of approaches for applying the TSC Industries standard in cases involving the nondisclosure of soft information.[20] In Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court considered whether the failure to disclose preliminary merger discussions was a material omission.[21] The Court stated that where an "event is contingent or speculative in nature, it is difficult to ascertain whether the 'reasonable investor' would have considered the omitted information significant at the time." Id. at 232, 108 S.Ct. at 983. The Court rejected the approach applied in this circuit under which preliminary merger negotiations were deemed immaterial as a matter of law until an "agreement in principle" as to the price and structure of the transaction had been reached. Id. at 233-34, 108 S.Ct. at 986 (rejecting Greenfield v. Heublein, Inc., 742 F.2d 751 (3d Cir.1984), cert. denied, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985); Staffin v. Greenberg, 672 F.2d 1196 (3d Cir.1982)). According to the Court, the materiality of preliminary merger discussions should depend on the facts and involves the balancing of both the probability that the event will occur and the anticipated magnitude of the event. Id. at 238-39, 108 S.Ct. at 987 (citing SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir.1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)).[22]
 
 
 57
 In Flynn v. Bass Bros. Enterprises, 744 F.2d 978 (3d Cir.1984), we considered the materiality of undisclosed asset appraisals in the context of a tender offer. In light of the policy change by the SEC, we held that asset appraisals and other soft information are not immaterial as a matter of law; rather, courts should ascertain the duty to disclose on a case-by-case basis, "weighing the potential aid such information will give a shareholder against the potential harm, such as undue reliance, if the information is released with a proper cautionary note." Id. at 988. We listed seven factors a court should consider in evaluating the omitted information: 1) the facts upon which the information is based; 2) the qualifications of those who prepared or compiled it; 3) the purpose for which the information was originally intended; 4) its relevance to the stockholders' impending decision; 5) the degree of subjectivity or bias reflected in its preparation; 6) the degree to which the information is unique; 7) and the availability to the investor of other more reliable sources of information. Id.[23]
 
 
 58
 In this case, the prospectus indicated that management planned to invest approximately $4.5 million of the $7.5 million proceeds from the initial offering in expanding the business. This would involve "expansion of the wholesale distribution network for beds and chairs" and "the acquisition of other related businesses and other types of products for in-home direct sales by the Company and its distributors." The prospectus made no representation as to what or how new products would be marketed in the future. The prospectus stated with respect to the proposed expansion:
 
 
 59
 The Company considers the acquisition of additional related businesses or products to be an acceptable method of achieving growth and is presently engaged in negotiations and product studies with respect to potential acquisitions in the water purification and security/energy saving window shutter markets. No understanding or agreement in principle relating to any acquisition presently exists between the Company and any third party. There can be no assurance that any acquisition will be effected, or that, if effected, it will be successful.
 
 
 60
 The Company proposes to establish a finance subsidiary to supplement its existing financing arrangement for customers of the Company and its distributors and believes that this will also permit the Company to expand. See "Use of Proceeds."
 
 
 61
 The Company's expansion program will require substantial additional funds for advertising and promotion, higher levels of inventories, additional personnel and, in the case of acquisitions of a business or new products, funds for such acquisition, development of a distribution network and the purchase or production of such products.
 
 
 62
 These statements are not challenged by plaintiffs.
 
 
 63
 Thus, in the Spring of 1986, Craftmatic sought to raise substantial new capital for the purpose of significantly altering its business. Moreover, the form that this significant alteration would take had not yet been determined. Understandably, Craftmatic and its underwriter chose not to predict the future course of its business and its future profitability. The prospectus makes no reference to future income, expenses, or profits other than the "additional funds" statement quoted above. In fact, plaintiffs make no claim that management possessed any forecasts regarding these matters, much less forecasts with some indicia of reliability. Therefore, it would be impossible for the district court to make a Flynn type evaluation of the omitted information.
 
 
 64
 Since corporations rarely make deliberate decisions to suffer large business losses, we think it highly unlikely that management would have disclosed any information that would have altered the mix of information available to potential investors, even if the law at the time had required that management formulate and include such predictions in the prospectus. Indeed, had the omitted projections been made, we are confident that plaintiffs would have asserted that such predictions lacked a reasonable basis and, accordingly, were actionable, as they have with respect to the predictions that were made at a later time.
 
 
 65
 In these circumstances, we have no difficulty in affirming the district court's conclusion that the omitted predictions would have been sufficiently speculative and unreliable to be immaterial as a matter of law.
 
 V. Failure to Satisfy Fed.R.Civ.P. 9(b)
 
 66
 The district court dismissed Counts II and III, to the extent they incorporated Subparagraphs 49(q)-(t),[24] for failure to comply with the particularity requirement of Fed.R.Civ.P. 9(b).[25] In these subparagraphs, plaintiffs allege the failure to disclose that certain projections were made without a reasonable basis.
 
 
 67
 We need not decide the sufficiency of (q)-(t) with respect to Count III, the Sec. 12(2) claim. In Count III, plaintiffs allege that defendants sold securities by means of a registration statement and prospectus containing material misstatements and omissions.[26] According to plaintiffs, these documents were dated and effective March 5, 1986. The projections described in subparagraphs (q)-(t), however, were made in reports and press releases issued after March 5, 1986.[27] Thus, defendants could not have disclosed in the registration statement and the prospectus that the projections were made without a reasonable basis. Moreover, plaintiffs do not allege that the registration statement and prospectus were updated, or that defendants had a duty to amend the documents, nor are such allegations implicit in the Complaint. Therefore, we find that subparagraphs 49(q)-(t) cannot form the basis for plaintiffs' Sec. 12(2) claim.[28]
 
 
 68
 In Count II, plaintiffs allege that defendants' misstatements and omissions violated Sec. 10(b) and Rule 10b-5. Fed.R.Civ.P. 9(b) requires plaintiffs to plead the circumstances of the alleged fraud with particularity to ensure that defendants are placed on notice of the "precise misconduct with which they are charged, and to safeguard defendants against spurious charges" of fraud. Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir.1984), cert. denied, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). The first sentence of Rule 9(b) requires the identification of the elements of the fraud claim. Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96, 99 (3d Cir.1983) (citing C. Clark, Code Pleading Sec. 48, at 312 (2d ed. 1947)). Nonetheless, focusing exclusively on the particularity requirement is " 'too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.' " Id. at 100 (quoting C. Wright & A. Miller, 5 Federal Practice and Procedure Sec. 1298, at 407 (1969)); see also Seville, 742 F.2d at 791 (allegations of date, time, or place fulfill functions of Rule 9(b)).
 
 
 69
 Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud." Christidis, 717 F.2d at 99-100. Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir.1987); C. Wright & A. Miller, Sec. 1298 at 416. Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control. Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir.1989); Michaels Building Co. v. Ameritrust Co., 848 F.2d 674, 680 (6th Cir.1988); DiVittorio v. Equidyne Extractive Industries, Inc., 822 F.2d 1242, 1248 (2d Cir.1987); see Saporito v. Combustion Engineering Inc., 843 F.2d 666, 675 (3d Cir.1988) (pleadings do not satisfy Rule 9(b); no reason to believe that additional information is in the exclusive control of defendant), vacated on other grounds, --- U.S. ----, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989). We agree that rigid enforcement in such circumstances could permit "sophisticated defrauders" to avoid liability. Nonetheless, even under a non-restrictive application of the rule, pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based. See Moore, 885 F.2d at 540; MaDonna v. United States, 878 F.2d 62, 66 (2d Cir.1989); Stern v. Leucadia National Corp., 844 F.2d 997, 1003 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988); DiVittorio, 822 F.2d at 1248; Wool, 818 F.2d at 1439; Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir.1986).
 
 
 70
 Subparagraphs 49(q)-(t) allege the failure to disclose that certain projections for Craftmatic's performance were made without reasonable basis. A projection that is issued without a reasonable basis is an untrue statement and actionable under Sec. 10(b) and Rule 10b-5 if made knowingly or recklessly. Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). Plaintiffs allege that defendants knowingly or recklessly misrepresented and omitted material facts. In subparagraphs 49(q)-(t), plaintiffs provide defendants with notice of the dates, the speaker, and the actual projections at issue. Moreover, plaintiffs allege that "there was no reasonable basis" for the projections. Defendants contend that these allegations are insufficient because they fail to explain why there was no reasonable basis.
 
 
 71
 Under a flexible application of Rule 9(b), plaintiffs need not necessarily allege the specific information at defendants' disposal at the time the projections were made. However, plaintiffs must accompany their allegations with facts indicating why the charges against defendants are not baseless and why additional information lies exclusively within defendants' control. We recognize that the district court provided plaintiffs with an opportunity to amend the Complaint to provide greater specificity, Fed.R.Civ.P. 15, and that plaintiffs decided to stand on their pleadings. However, because this pleading requirement has not previously been set forth in detail in this circuit, we will reverse the dismissal of Count II to the extent it relies on subparagraphs 49(q)-(t), and remand so that plaintiffs may have another opportunity to amend their Complaint. Given our treatment of these subparagraphs, we need not decide whether they adequately state a claim under Sec. 10(b) and Rule 10b-5.[29]
 
 VI. Conclusions
 
 72
 Subparagraphs 49(a)-(c), (h), and (n): These subparagraphs allege the omission or misrepresentation of information regarding Craftmatic's advertising, promotion, and marketing program. The value of this information to prospective investors does not depend solely on whether there has been a breach of duty or ineffective management. This information could be material to an investor's evaluation of the offered securities. Therefore, we will reverse the district court's holding that these subparagraphs fail to state a claim under federal securities law.
 
 
 73
 Subparagraphs 49(d), (e), (g), (m), (p), and a portion of (a): These subparagraphs allege that defendants failed to disclose predictions and opinions that, if made, would have amounted to no more than speculation about the future. Therefore, we will affirm the district court dismissal of Counts I-III to the extent they rely on these subparagraphs.
 
 
 74
 Subparagraphs 49(f), (i)-(l): These subparagraphs allege that defendants omitted information, disclosure of which would serve only to place investors on notice of management problems and poor business judgment. The concerns underlying the securities acts are not implicated by such nondisclosures. Therefore, we will affirm the dismissal of Counts I-III to the extent they rely on these subparagraphs.
 
 
 75
 Subparagraphs (q)-(t): These subparagraphs allege that defendants failed to disclose that projections regarding company performance were made without a reasonable basis. We will reverse the dismissal of Count II to the extent it incorporates these subparagraphs and remand to allow plaintiffs to amend their Complaint. However, because the projections at issue were made in a report and press releases issued after the filing of the registration statement and the prospectus, these subparagraphs cannot form the basis of plaintiffs' Sec. 12(2) claim in Count III.
 
 
 76
 For the reasons discussed above, we will reverse the dismissal of Counts I-III to the extent they incorporate subparagraphs 49(a)-(c), (h), (n), and (o )--the only subparagraph remaining following the district court decision. With respect to Count II and subparagraphs 49(q)-(t), we will reverse and remand with the direction that plaintiffs be permitted to amend these subparagraphs of the Complaint under Fed.R.Civ.P. 15.
 
 
 77
 We will reverse the dismissal of Count III against the Craftmatic defendants because we find that plaintiffs' allegations are sufficient to claim that those defendants were sellers within the meaning of Sec. 12(2). Given the reinstatement of these claims under federal law, we will reverse the dismissal of plaintiffs' state law claims for lack of pendent jurisdiction, and remand to the district court for proceedings consistent with our decision. We will affirm the remainder of the district court's judgment.
 
 
 78
 Each side to bear its own costs.
 
 
 
 [1]
 We will refer to Craftmatic, Inc., and the Kraftsows as "the Craftmatic defendants."
 
 
 [2]
 Complaint, p 21 provides:
 Direct in-home sales and the promotion and advertising connected therewith are regulated by consumer protection agencies of federal, state and local governments. The Prospectus reported that in 1985, Craftmatic signed a Consent Order with the Federal Trade Commission, "which resulted from an inquiry by that agency into certain of the Company's advertising and marketing activities." Similar such orders known as Assurances of Voluntary Compliance were entered into by Craftmatic with the State of Florida in 1985 and with the Commonwealth of Pennsylvania in 1982 and 1985. The Consent Order and Assurances of Voluntary Compliance required the Company to change its procedures and practices, including, inter alia: (a) greater specification of and fuller compliance with warranty provisions; (b) the establishment of a standard to determine if a price is a reduced price or a special price; (c) instructing sales representatives to correctly state their positions with the Company; and (d) monitoring of the cancellation provisions of sales contracts and the practices for processing cancellations. Notwithstanding the requirements imposed by these Orders on Craftmatic's sales practices, the Company boldly proclaimed in the Prospectus that, "None of these requirements, in the opinion of the Company, has had a material adverse effect on its business." Moreover, the Company proclaimed that it "believes that it is presently in compliance with consumer protection requirements."
 
 
 [3]
 Section 11(a) provides:
 (a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--
 (1) every person who signed the registration statement;
 (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
 (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
 (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;
 (5) every underwriter with respect to such security.
 If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.
 15 U.S.C. Sec. 77k(a) (1988).
 
 
 [4]
 Section 10(b) prohibits using "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." 15 U.S.C. Sec. 78j(b) (1988)
 Pursuant to Sec. 10(b), the SEC promulgated Rule 10b-5, which provides:
 It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. Sec. 240.10b-5 (1988)
 
 
 [5]
 Paragraph 49 of the Complaint provides: "The practices and devices utilized by the defendants in order to effectuate the aforesaid conspiracy consisted of defendants' misrepresentations (in the name of Craftmatic), and failure to disclose omitted material facts which were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs and the members of the Class. These misrepresentations and omissions, which are also acts of false advertising, were in whole or in part contained in, or omitted from, among other documents, the Company's Annual Report and each of its Quarterly Reports to its shareholders issued during the Class Period, together with the registration statement and prospectus issued in connection with the foregoing initial public offering, and the news releases and other statements referred to above, which were prepared in the name of Craftmatic with the participation, acquiescence, cooperation, encouragement and assistance of each of the individual defendants and, as to the registration statement and prospectus, defendant Advest. All of these documents were materially false and misleading in that they:
 (a) Failed to disclose that the success of Craftmatic's advertising and marketing program was dependent on unfair and deceptive sales practices in violation of consumer protection statutes, regulations, and other laws enforced by federal, state, and local agencies, which practices would and did result in serious charges being brought against Craftmatic and its being forced to pay substantial fines and restitution resulting in enormous ill will by consumers towards Craftmatic and its products;
 (b) Failed to disclose that Craftmatic's 'independent' distribution network relied on advertising, marketing, or other promotional materials or techniques created for or developed by the Company that contained false and misleading information in violation of consumer protection statutes, regulations, and other laws enforced by federal, state and local agencies;
 (c) Failed to disclose that Craftmatic's advertising, marketing, or other promotional materials or techniques violated the consumer protection laws of federal, state and local governments, as well as the terms of various Consent Orders and Assurances of Voluntary Compliance entered into between Craftmatic and federal and state governments;
 (d) Failed to disclose that Craftmatic's rapid expansion program entailed an unusual and extremely high risk of failure, particularly in connection with its development of new product lines and its acquisition and/or resale of distributorships, and that, in embarking upon its abnormally speculative venture, the Company was essentially gambling with its profitability;
 (e) Failed to disclose that Craftmatic's application of the advertising and marketing strategies of its core bed and chair business to new product lines entailed enormous costs that would far outstrip the revenues generated by the new product lines and hurt the Company's profitability;
 (f) Failed to disclose that Craftmatic's internal product studies, investigations, examinations or plans provided little or no meaningful information concerning the question of whether Craftmatic could profitably expand, particularly into new product lines, given the necessity to expend substantial financial resources in support of such expansion;
 (g) Failed to disclose that in order to report increases in total net sales, Craftmatic required an ever increasing number of distributorships in uncertain marketing territories, as well as commensurate increases in promotional costs and expensive print and electronic media advertising expenditures, without which Craftmatic's total net sales would stagnate or decline;
 (h) Failed to disclose that Craftmatic received an abnormally high level of customer complaints;
 (i) Failed to disclose that Craftmatic was totally unfocused in that it tried to concentrate on more types of businesses than it had the ability and resources to efficiently manage, and that far from expanding its business, the Company was unable to manage the businesses in which it was already involved;
 (j) Failed to disclose that Craftmatic's costs and expenses, particularly those associated with advertising and marketing, were out of control and that the Company did not have adequate internal management controls and corporate wide cost control measures to monitor effectively the costs generated by Craftmatic's rapid expansion;
 (k) Failed to disclose that Craftmatic was experiencing severe operational and organizational problems resulting from the absence of adequate or effective systems to control the expansion which had taken place both before and after its initial public offering, as well as the absence of financial reporting and accounting controls necessary to monitor or measure the current or future financial performance of the Company;
 (l ) Failed to disclose that Craftmatic's management information systems were wholly inadequate in providing timely and accurate information so as to permit management properly to forecast, control, and account for the Company's growing expenses, financial requirements, and overall financial performance;
 (m) Failed to disclose that Craftmatic's rate of growth in its core bed and chair business was not sustainable;
 (n) Misrepresented that Craftmatic's Contour Lounge was a 'custom-fitted' chair manufactured to customer specifications;
 (o ) Failed to disclose that the 'inquiries' of the States of Washington and Oregon as described in the April 16, 1987 preliminary prospectus were focused on Craftmatic, as well as Western Contour, and that its promotional, advertising, marketing or other sales tactics as well as that of Western Contour were being investigated;
 (p) Failed to disclose that Craftmatic's water purification and security shutter product lines were not amenable to being marketed successfully by the in-home direct sales techniques that were developed for the Company's core bed and chair business;
 (q) Failed to disclose that there was no reasonable basis for defendant Kraftsow's June 19, 1986 statement that, 'Our introduction of the two new product lines, water purification systems, and security shutters during 1986, are expected to generate $14 million in revenues during 1987. This is an addition to the $53 million expected from our established products ...';
 (r) Failed to disclose that there was no reasonable basis for defendant Kraftsow's statement in Craftmatic's 1986 Annual Report with respect to measures to control advertising costs that, 'We can already foresee substantial cost savings for our Company and our distributors';
 (s) Failed to disclose that there was no reasonable basis for defendant Kraftsow's statement in Craftmatic's 1986 Annual Report that, 'We are very confident that before the close of Fiscal 1987 we shall demonstrate clearly the growth potential of American Aqua IV and our York customer security shutters'; and
 (t) Failed to disclose that there was no reasonable basis for defendant Kraftsow's statement in a company news release issued on or about March 18, 1987 that Craftmatic would achieve 'substantial profits' for the quarter ending March 31, 1987 and that 'the Company's security shutter and water purification operations which negatively impacted results of operations for the quarter ended December 31, 1986 could be expected to make a substantial contribution to earnings during the Company's third quarter ending September 30, 1987 (sic)'."
 
 
 [6]
 Plaintiffs also appeal the dismissal of their common law claims contained in Count IV. All parties agree that the district court's pendent jurisdiction requires survival of one of the federal claims. United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 195-96 (3d Cir.1976). Given our disposition of the federal claims, these claims will be reinstated
 
 
 [7]
 Section 12 provides:
 Any person who--
 (1) offers or sells a security in violation of section 77e of this title, or
 (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
 shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 15 U.S.C. Sec. 77l (1988). Section 5 of the Securities Act, 15 U.S.C. Sec. 77e, to which Sec. 12(1) refers, prohibits the sale of unregistered securities not exempted under Sec. 3 of the Securities Act, 15 U.S.C. Sec. 77c (1988).
 
 
 [8]
 See, e.g., Pinter, 108 S.Ct. at 2078 ("An interpretation of statutory seller that includes brokers and others who solicit offers to purchase securities furthers the purposes of the Securities Act--to promote full and fair disclosure of information to the public in the sales of securities.")
 
 
 [9]
 The two provisions differ in that under Sec. 12(1), one who offers or sells an unregistered security that is not exempt under Sec. 3 of the Securities Act, 15 U.S.C. Sec. 77c (1988), is strictly liable to the purchaser. See Pinter, 108 S.Ct. at 2078, 2081. Section 12(2) creates liability for one who offers or sells a security by means of a prospectus or oral communication that contains a material misstatement or omission. Under Sec. 12(2), however, a defendant can avoid liability by proving he did not know, or through the exercise of reasonable care could not have known, of the untruth or omission. 15 U.S.C. Sec. 77l (1)-(2) (1988)
 
 
 [10]
 The Court noted that Congress employed the collateral participation concept in Sec. 11(a), which enumerates categories of persons in the registration process who may be held liable under that section, including those who participate in activities leading up to the sale. Because there are no similar provisions in Sec. 12, the Court concluded that "Congress did not intend such persons to be defendants in Sec. 12 actions." 108 S.Ct. at 2080 n. 26
 
 
 [11]
 Subparagraph 49(m) cannot form the basis of securities law claims for reasons discussed in Section IV, infra
 
 
 [12]
 According to the Court, Delaware corporate law permits a parent corporation owning at least 90% of the outstanding stock of a subsidiary to exchange the minority shareholders' stock for cash, without notice to or approval of the minority shareholders, The minority shareholders' alternative is to seek appraisal rights for their shares. 430 U.S. at 465-66, 97 S.Ct. at 1296-97 (citing Del.Code Ann. tit. 8, Secs. 253, 262 (1975 & Supp.1976))
 
 
 [13]
 The Court stated that "manipulation" is virtually a term of art that refers to practices deemed by the SEC to artificially affect market activity, such as wash sales, matched orders, or rigged prices. 430 U.S. at 476-77, 97 S.Ct. at 1302-03. According to the Court, the prohibition of such practices is fully consistent with the full disclosure policy of the 1934 Act. "Indeed, nondisclosure is usually essential to the success of a manipulative scheme." Id. at 477, 97 S.Ct. at 1303. Moreover, in Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985), the Court cited Santa Fe, among other cases, for the proposition that "Congress used the phrase 'manipulative or deceptive' in Sec. 10(b) ... and we have interpreted 'manipulative' in that context to require misrepresentation." Id. 472 U.S. at 7-8, 105 S.Ct. at 2462
 
 
 [14]
 The claims in Santa Fe arose under Sec. 10(b) and Rule 10b-5. Nonetheless, the holding and reasoning apply equally to claims arising under Sec. 11(a), and Sec. 12(2). The Santa Fe Court based its conclusions on the language of the section and Congress' purpose in enacting the statute. As the Court indicated, the fundamental purpose of the Securities and Exchange Act of 1934 is to ensure full and fair disclosure in securities transactions. 430 U.S. at 477-78, 97 S.Ct. at 1302. Sections 11(a) and 12(2) are provisions of the Securities Act of 1933, which similarly protects investors through full disclosure of material information. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). Moreover, under all three sections, liability flows from material misrepresentations or omissions. Therefore, to the extent that the holding in Santa Fe is grounded on the underlying statutory goal of full and fair disclosure, the decision applies to claims brought under Sec. 11 and Sec. 12(2)
 
 
 [15]
 Subparagraph 49(a) also alleges that defendants failed to disclose that "these practices would and did result in serious charges being brought against Craftmatic...." We will address that portion of (a) in Section IV, infra
 
 
 [16]
 Advest claims that even if the allegations in subparagraphs 49(a)-(c) are true, defendants were not required to disclose uncharged criminal conduct under federal securities law. The statutes and regulations do not require disclosure of all information within the knowledge of defendants. However, the nondisclosure of a statutory violation may be an omission of information necessary to make other statements not misleading. To that extent, a violation of consumer laws that is substantially likely to be significant to a reasonable investor is a fact that must be disclosed, even though the legal consequence of the violation may be a contingency. See Roeder v. Alpha Industries, Inc., 814 F.2d 22, 25 & n. 1 (1st Cir.1987) (we cannot conclude on the basis of the pleadings that the alleged bribery did not become material until defendants learned of criminal indictment)
 
 
 [17]
 Disclosures mandated by law are presumably material. See Brudney, A Note on Materiality and Soft Information Under the Federal Securities Laws, 75 Va.L.Rev. 723, 727 (1989). However, when defendants voluntarily disclose information, they have a duty to disclose additional material facts only to the extent that the volunteered disclosure was misleading as to a material fact. Basic Inc. v. Levinson, 485 U.S. 224, 238, 108 S.Ct. 978, 986-87, 99 L.Ed.2d 194 (1988) (plaintiff must show statements were misleading as to material fact; not enough to show statement is false or incomplete if misrepresented fact is otherwise insignificant)
 
 
 [18]
 In Basic Inc., the Supreme Court expressly adopted the TSC Industries standard of materiality for Sec. 10(b) and Rule 10b-5. 485 U.S. at 232, 108 S.Ct. at 983; see also Flynn v. Bass Bros. Enterprises, 744 F.2d 978, 985 (3d Cir.1984). Other courts have held that the definition of materiality from TSC Industries applies to actions under both Sec. 11 and Sec. 12(2). See, e.g., Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 731 (2d Cir.1987) (Sec. 11 action), cert. denied, --- U.S. ----, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988); Alton Box Board Co. v. Goldman, Sachs & Co., 560 F.2d 916, 919-20 (8th Cir.1977) (Sec. 12(2) action); Akerman v. Oryx Communications, Inc., 609 F.Supp. 363, 367 (S.D.N.Y.1984) (both Sec. 11 and Sec. 12(2) actions), affirmed and remanded on other grounds, 810 F.2d 336 (2d Cir.1987)
 
 
 [19]
 According to the SEC, the following factors may provide a reasonable basis for management projections: a history of operations or experience in making predictions, an outside review of management projections if the report discloses the qualifications of the reviewer, the extent of the review, the relationship between the reviewer and the registrant, and the process by which the review was sought. 17 C.F.R. Sec. 229.10(b)(1) (1988)
 
 
 [20]
 See, e.g., Walker v. Action Industries, Inc., 802 F.2d 703, 709-10 (4th Cir.1986) (no duty to disclose financial projections that were uncertain and misleading in nature), cert. denied, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987); Starkman v. Marathon Oil Co., 772 F.2d 231, 240-41 (6th Cir.1985) (soft information such as asset appraisals and projections must be disclosed only if reported values are virtually as certain as hard facts), cert. denied, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); Flynn v. Bass Bros. Enterprises, 744 F.2d 978, 988 (3d Cir.1984) (asset appraisals not immaterial as a matter of law; duty to disclose must be decided on a case by case basis); Panter v. Marshall Field & Co., 646 F.2d 271, 292 (7th Cir.) (no duty to disclose projections or estimates unless company has undertaken partial disclosure; management must be reasonably certain of information before releasing it to public), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); see generally Kerr, A Walk Through the Circuits: The Duty to Disclose Soft Information, 46 Md.L.Rev. 1071 (1987)
 
 
 [21]
 The Court expressly limited its holding to the disclosure of merger discussions, stating "[w]e do not address here any other kinds of contingent or speculative information, such as earnings forecasts or projections." 485 U.S. at 232 n. 9, 108 S.Ct. at 984 n. 9
 
 
 [22]
 In rejecting a bright-line rule in favor of a fact-dependent approach to materiality, the Court noted that inside information regarding merger discussions may become material at an earlier stage than would be the case with other transactions " '[s]ince a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death....' " 485 U.S. at 238, 108 S.Ct. at 987 (quoting SEC v. Geon Industries, Inc., 531 F.2d 39, 47-48 (2d Cir.1976))
 
 
 [23]
 As in TSC Industries and Basic Inc., the Flynn approach is fact-dependent. Consideration of the Flynn factors permits an assessment of the reliability and relevance to the investor of the omitted information, as well as the probability that a given contingent event will occur
 
 
 [24]
 Subparagraphs 49(q)-(t) are not a part of Count I, the Sec. 11 claim, which incorporates by reference and realleges only Subparagraphs 49(a)-(n)
 
 
 [25]
 Fed.R.Civ.P. 9(b) provides:
 In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
 
 
 [26]
 Section 12(2) imposes liability upon those who sell securities by means of a prospectus or oral communication that includes material misstatements or omissions. 15 U.S.C. Sec. 77l (2) (1988). Plaintiffs do not base their Sec. 12(2) claim on sales made by means of oral communications. Moreover, the projections described in subparagraphs 49(q)-(t) were not made orally
 
 
 [27]
 In the subparagraphs at issue, plaintiffs allege that the registration statement and prospectus, among other documents, failed to disclose that there was no reasonable basis for statements made by Kraftsow in a June 19, 1986 press release, the 1986 Annual Report, and a March 18, 1987 press release
 
 
 [28]
 There is a question whether Fed.R.Civ.P. 9(b) applies to Sec. 12(2). Rule 9(b) requires fraud and mistake to be pled with particularity. C. Wright & A. Miller, 5 Federal Practice and Procedure Sec. 1297, at 405 (1969 & Supp.1989); see Rose v. Bartle, 871 F.2d 331, 362 n. 53 (3d Cir.1989) (Rule 9(b) inapplicable; plaintiffs' claims of bribery and extortion do not allege fraud on part of defendants); Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96, 99 (3d Cir.1983) (Rule 9(b) applies to fraud actions under federal statutes and fraud claims based on state law). Neither fraud nor mistake is a necessary element of a Sec. 12(2) claim. Under Sec. 12(2), defendants may be held liable for negligent misrepresentations or omissions. 15 U.S.C. Sec. 77l (2) (1988); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 208-09, 96 S.Ct. 1375, 1388-89, 47 L.Ed.2d 668 (1976) (section 12 allows recovery for negligent conduct). Given our disposition of these subparagraphs with respect to the Sec. 12(2) claim, we need not decide this issue
 
 
 [29]
 Plaintiffs also contend that the district court erred in evaluating the materiality of the omissions individually rather than cumulatively. Allegations of fraud are adequately pled if the elements of fraud are fairly alleged somewhere in the course of the complaint so as to put defendants on notice as to the claim, even though all of the elements of fraud are not recited in the same paragraph. However, to the extent the individual subparagraphs fail to plead an omission or misstatement adequately, the deficiency will not be cured solely by stringing together such pleadings