856 F.2d 473
 Blue Sky L. Rep. P 72,901, Fed. Sec. L. Rep. P 94,007
Daniel CAPRI, Stanley Machenberg, Robert A. Epstein, Ronald
A. King, Paul A. Plotkin, Frederick Gilchrist, Joseph D.
Waxberg, Victor Wall, Martin Fox, William Capri, Gerard
Davis, Eve Kotkin, Sanford P. Young, James L. Cohen, Bruce
Weale, Plaintiffs-Appellants, Cross-Appellees,
v.
C. Gordon MURPHY, Greenwich Coal Associates, Greenwich Coal
Company, Liberty Capital Group, Defendants and
Third-Party Plaintiffs-Appellees, Cross-
Appellants,
v.
GATES ENGINEERING COMPANY, Third-Party Defendant-Appellee.
 Nos. 1137, 1248, Dockets 88-7051, 88-7053.
 United States Court of Appeals,
Second Circuit.
 Argued June 2, 1988.
Decided Aug. 31, 1988.
 
 James R. Fogarty, Stamford, Conn. (Andrew P. Nemiroff, Epstein & Fogarty, Stamford, Conn., of counsel), for Capri, et al.
 Richard L. Albrecht, Bridgeport, Conn. (Cohen & Wolf, P.C., Bridgeport, Conn., of counsel), for Murphy, et al.
 Eugene A. Cooney, Hartford, Conn. (Cooney, Scully & Dowling, Hartford, Conn., of counsel), for Gates Engineering Co.
 Before KAUFMAN and MINER, Circuit Judges, CONNER,* District Judge.
 MINER, Circuit Judge:
 
 
 1
 Plaintiffs Daniel Capri, et al., and defendants-third-party plaintiffs C. Gordon Murphy, et al., appeal from a judgment of the United States District Court for the District of Connecticut (Dorsey, J.), imposing liability on defendants for negligently promoting a coal-mining venture and dismissing plaintiffs' claims under federal and Connecticut securities laws as well as the third-party claim against Gates Engineering Company ("Gates") for indemnification. For the reasons that follow, we affirm the district court on the negligence claim, reverse the court's dismissal of plaintiffs' claims under section 12(2) of the Securities Act of 1933 and Conn.Gen.Stat. Sec. 36-498(a), and remand with instructions to enter judgment against defendants Murphy and Greenwich Coal Company, to make further factual findings with respect to defendant Liberty Capital Group, and to amend the determination of plaintiffs' damages.
 
 BACKGROUND
 
 2
 Plaintiffs invested $522,500 in cash and notes as limited partners in Greenwich Coal Associates ("GCA"), a coalmining venture formed on December 29, 1977. GCA was intended to be a "year-end" tax shelter, whose purpose was to mine coal from property owned by Herbert and Effie Pauley in West Virginia. Plaintiffs, collectively, represented 45% of the ownership interest in GCA. Defendant C. Gordon Murphy, who had extensive experience in developing and mining coal properties, was one of two general partners in GCA and owned 1% of the partnership. Defendant Greenwich Coal Company, a corporation formed on or about December 29, 1977, was the other general partner in GCA, owning 49% of the partnership. The remaining 5% interest was owned by two investors who are not plaintiffs here. For their 50% interest in GCA, Murphy and Greenwich Coal Company invested $125,000. Greenwich Coal Company, in turn, was owned two-thirds by Liberty Capital Group ("LCG"), a partnership consisting of Murphy, Robert Reardon and Marshall Brown, and one-third by Energy Resources, a corporation whose stock was owned by Robert Fain and Fain's law partners and associates. Murphy, Reardon and Brown all were experienced in owning, structuring and managing coal properties. Fain, whose law firm drafted the prospectus and performed other legal work in connection with the venture, also was President of Greenwich Coal Company.
 
 
 3
 In November 1977, Liberty Capital Group acquired two sixty-day options to lease the Pauley property. The GCA general partners set up the venture so that LCG would exercise its option to lease the Pauley property, and the Pauleys would receive a royalty of 6% of the gross selling price or an annual minimum royalty of $24,000. LCG would then sublease the property to GCA, and LCG would receive a royalty of $3.00 per ton or an annual minimum of $480,000. The LCG royalty was intended to maximize the limited partners' tax write-offs for 1977.
 
 
 4
 In early November, Murphy hired Gates Engineering Company to determine the economic feasibility of mining the property and to recommend a plan for mining and selling the coal. However, Gates never was told of GCA's obligation to pay royalties, a necessary factor in determining the economic feasibility of the venture. Gates produced a preliminary report ("Gates Report"), dated December 10, 1977, which concluded that two coal seams on the Pauley property were "minable and merchantable." The Gates Report projected a selling price of $45.00 per ton for the "No. 2 Gas" seam and $22.50 per ton for the "Stockton" seam. Gates later revised the price of the "No. 2 Gas" seam to $33.50 per ton and informed Murphy of the revision in February 1978. However, neither the original nor the revised Gates Report reflected any expenses for washing or selling the coal, which would have adversely affected profitability.
 
 
 5
 The original Gates Report also noted the need to construct a three-mile road suitable for heavily-loaded trucks in order to transport the coal; however, Murphy failed to obtain an estimated cost for the road construction and to assess the impact of that cost prior to the closing of the deal. The parties later discovered that the road would cost up to $1.5 million, which would substantially and adversely affect the feasibility of the project. In addition, Murphy knew of the recent enactment of the Surface Mining Act of 1977 prior to the closing and understood that this legislation was a "drastic change in the law" which "revolutionized" coal strip mining in the United States. Nevertheless, the impact of this legislation on the project never was communicated to plaintiffs either personally or in the prospectus.
 
 
 6
 In mid-December, Fain's law firm prepared a draft prospectus. The prospectus projected profits of between $409,000 and $691,000 from the "Stockton" seam and between $6,411,000 and $6,690,000 from the "No. 2 Gas" seam. Although none of the plaintiffs knew any specific facts about the venture other than those stated in the prospectus, all of the plaintiffs made commitments, and six plaintiffs paid their entire subscription costs, before the prospectus ever was issued. None of the plaintiffs had experience in the coal business prior to investing in GCA. Each plaintiff relied upon the representations of Murphy, Reardon and Fain, as communicated by Fain and Daniel Conover, regarding the venture's potential. Conover was a former partner in Fain's law firm. Many of these same representations later were included in the prospectus. From the beginning, plaintiffs' primary motivation for investing in the project was to obtain tax write-offs.
 
 
 7
 On December 29, 1977, LCG exercised its option and entered into a lease with the Pauleys, providing for payments to the Pauleys commencing on November 1, 1978. LCG subleased the property to GCA, with royalty payments to LCG commencing upon the closing. That day, GCA paid LCG $480,000, but LCG defaulted on its obligation to pay the minimum due the Pauleys. LCG eventually paid the Pauleys a total of $8,000, resulting in litigation with the Pauleys and termination of the lease.
 
 
 8
 Despite the parties' intentions, the coal-mining venture never came to fruition. Defendants had intended to hire an operator to mine the coal, which would be sold through Neville Coal Sales Company, a corporation of which Liberty Capital Group was a shareholder. Well into 1978, Murphy's communications to the limited partners reflected enthusiasm and optimism for the project. However, GCA never mined any coal, and the IRS subsequently disallowed the limited partners' deductions for payments to GCA, concluding that the project lacked economic viability at inception. In December 1978, Murphy flagged most of the project's problems in a letter to plaintiffs, but he did not inform them of the project's economic infeasibility until July 1979.
 
 
 9
 In December 1980, sixteen of the seventeen limited partners instituted this action, seeking recovery of their total principal invested in GCA, plus interest, punitive damages, costs and attorneys fees. Plaintiffs' complaint alleged that GCA's general partners omitted or misrepresented material facts in promoting the partnership, in violation of: sections 12(2) and 17(a) of the Securities Act of 1933 (Count I); section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (Count II); sections 36-472 and 36-498(a) of the Connecticut Securities Act (Count III); and the Connecticut Unfair Trade Practices Act (Count IV). In addition, plaintiffs claimed that defendants: were negligent in omitting or misrepresenting material facts (Count V); had engaged in fraudulent misrepresentation (Count VI); and had breached their fiduciary obligations to plaintiffs (Count VII). Plaintiffs also brought a derivative suit against LCG, claiming that LCG entered into the sublease with GCA solely to obtain the minimum annual royalty from GCA despite knowledge of the project's economic infeasibility (Count VIII).
 
 
 10
 Defendants filed a third-party complaint against Gates, alleging that Gates should have foreseen the economic infeasibility of mining and selling the coal. Defendants claimed that Gates' failure constituted tortious conduct and that Gates should indemnify defendants for damages awarded to plaintiffs.
 
 
 11
 After a bench trial, Judge Dorsey found that plaintiffs had not shown sufficient proof of defendants' "state of knowledge and ... intent," Capri v. Murphy, No. B-80-571, slip op. at 32 (D.Conn. Dec. 10, 1987), to sustain their claims under Counts I-IV and Count VI. The court also held that defendants had not breached any fiduciary duties to plaintiffs, finding that while Murphy had interests in both LCG and GCA, the LCG-GCA sublease benefited plaintiffs by maximizing tax payments to plaintiffs as limited partners. Judge Dorsey also dismissed the derivative action against LCG, finding that the royalty payment to LCG was not excessive and that LCG had in fact used the royalty to pay the venture's start-up expenses.
 
 
 12
 However, the court held that defendants were negligent in promoting the venture. Specifically, the court found that defendants failed to inform the limited partners that: 1) the partnership would have to build, at a substantial cost, a road to transport the coal from the mine; 2) the market price for coal projected in the Gates Report was overly optimistic; and 3) GCA would have to comply with changes in the law resulting from the enactment of the Surface Mining Control and Reclamation Act of 1977 in order to mine the coal. This information, if disclosed, would have communicated the existence of a higher risk that the venture's projected profits might never be realized, and, might have altered plaintiffs' opinion of the project's feasibility. The court also found that Murphy should have known this information and should have realized that the Gates Report was insufficient in critical respects. The court held that Murphy should have acted to ensure that the report's conclusions were verified before the prospectus was completed. The court also determined that Fain and Conover, by actually promoting the deal, were agents of the defendants, and their acts were attributable to the general partners.
 
 
 13
 On the third-party claim, Judge Dorsey found that Gates was negligent in its preparation of the report, but that defendants were not entitled to indemnification because they failed to come within any exceptions to the general rule of Connecticut law barring contribution among joint tortfeasors.
 
 
 14
 The court awarded those plaintiffs who had paid the entire subscription cost "up front" the full amount of their capital contributions. However, those limited partners who chose to pay a percentage in cash and the remainder in one-year notes secured by irrevocable letters of credit received only the amount of their capital contributions paid up to December 1978. The court reasoned that because the defendants informed the limited partners in December 1978 of the project's troubles, payments made thereafter were made with knowledge of additional risks.
 
 
 15
 On appeal, plaintiffs claim that they should not have been required to prove scienter in order to prevail on the section 12(2) and Sec. 36-498(a) claims, and that even if scienter were required, the district court's findings of fact support the conclusion that scienter was proven. Plaintiffs also contend that the court erred in its computation of damages on the negligence count. Defendants contest the court's determination that they were negligent, arguing that: their actions were not the proximate cause of plaintiffs' losses; Gates' negligence was the proximate cause of plaintiffs' harm; and plaintiffs were contributorily negligent. Defendants also claim that the court erred in denying their indemnification claim against Gates.
 
 DISCUSSION
 
 16
 The parties do not contest the court's factual findings on appeal. In light of the court's finding that Fain and Conover were agents whose acts were attributable to GCA's general partners, we affirm the court's determination that defendants negligently promoted the venture. Moreover, in view of the court's finding that plaintiffs failed to prove scienter, we affirm the court's dismissal of plaintiffs' section 10(b) and Rule 10b-5 claims, see Mayer v. Oil Field Systems Corp., 803 F.2d 749, 756 (2d Cir.1986), as well as the common-law fraud claim.
 
 Sections 12(2) and 36-498(a) Claims
 
 17
 However, the court erred in dismissing plaintiffs' claims under section 12(2) of the Securities Act of 1933, 15 U.S.C. Sec. 77l(2) (1982), and Conn.Gen.Stat. Sec. 36-498(a) (West 1987 & Supp.1988). The Supreme Court recently addressed the meaning of the words "[a]ny person who ... offers or sells a security" as used in section 12(1) of the Securities Act of 1933, 15 U.S.C. Sec. 77l (1) (1982). See Pinter v. Dahl, --- U.S. ----, 108 S.Ct. 2063, 2075-76, 100 L.Ed.2d 658 (1988). Although the Supreme Court did not "take a position on" the scope of a "seller" for purposes of section 12(2), id. --- U.S. at ---- n. 20, 108 S.Ct. at 2076 n. 20, we previously have held that the language of sections 12(1) and 12(2) is identical in meaning, Schiller v. H. Vaughan Clarke & Co., 134 F.2d 875 (2d Cir.1943). Accordingly, we shall consider plaintiffs' section 12(2) claim in light of Pinter.
 
 
 18
 In Pinter, the Court held that section 12(1) "contemplates a buyer-seller relationship not unlike traditional contractual privity," --- U.S. at ----, 108 S.Ct. at 2076, but its scope is not "restricted to those who pass title," id. Rather, since "solicitation is the stage at which an investor is most likely to be injured," id. at 2078, the term "seller" must include the person "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner," id. at 2079.
 
 
 19
 Based on the district court's factual findings, we have no difficulty in concluding that Murphy and GCC, as general partners of GCA, are "sellers" within the meaning of section 12(2) whose material misrepresentations and omissions render them strictly liable to plaintiffs. The court specifically found that Murphy and GCC prepared and circulated the prospectus to plaintiffs, slip op. at 3, and that the prospectus omitted material facts which significantly affected the risk undertaken by the investors, id. at 30. The prospectus projected coal prices which were not justified, id., and failed to disclose the need to construct a road to transport the coal or the impact of the road's cost on the venture's feasibility, id. "Thus, the investors were unjustifiably led to believe that certain profits were likely when the more realistic probable prices, ascertainable from information available at the time, would have substantially reduced the expectable profit," id.
 
 
 20
 Murphy and GCC, nevertheless, contend that only Fain was in direct communication with plaintiffs and that he alone should bear full responsibility for any misrepresentations or omissions. While Fain, having promoted the deal and received compensation for his promotional efforts, id. at 5, 37, would have been liable as a "seller" if he were a named defendant, Fain's status as a "seller" does not preclude GCC and Murphy from being "sellers," too. In fact, Judge Dorsey specifically found that: Fain's promotional efforts were done "at the behest of Murphy," id. at 5; Fain "provided no information to the investors other than what was supplied by defendants," id. at 36; and Fain "took no action in relation to the investors other than that which was contemplated and authorized by defendants," id. at 36-37. Accordingly, Fain's promotional efforts are directly attributable to GCC and Murphy, and both are liable to plaintiffs under section 12(2).
 
 
 21
 As for LCG, plaintiffs alleged that between November 7 and December 29, 1977, LCG solicited each of the plaintiffs to invest in the venture, Jt.App. at 17-18 (Complaint, paragraphs 13-14). The district court indicated that the record contained extensive correspondence in the name of LCG, slip op. at 37. While there is no doubt that LCG played a major role in setting up the coal-mining venture, that is not sufficient to cast LCG as a "seller," see Pinter, --- U.S. at ----, 108 S.Ct. at 2080-82. Instead, plaintiffs must show that LCG actually solicited their investment in GCA, see id. --- U.S. at ----, 108 S.Ct. at 2080. Based on the record before us, we are unable to determine whether LCG made any such solicitations. Accordingly, we remand to the district court for further factual findings on this issue.
 
 
 22
 GCC and Murphy also are liable under Conn.Gen.Stat. Sec. 36-498(a) (West 1987 & Supp.1988). The language of Sec. 36-498(a) is virtually identical to the language of section 12(2) and, in the absence of state authority to the contrary, will be interpreted similarly, cf. Hitchcock v. deBruyne, 377 F.Supp. 1403, 1405-06 (D.Conn.1974) (Second Circuit's interpretation of federal statute applies to Connecticut statute that is the state "counterpart" of federal law). Accordingly, our conclusion that Murphy and GCC are liable under section 12(2) is sufficient to establish their liability under Sec. 36-498(a), and we remand with instructions to enter judgment in favor of plaintiffs on these claims and to determine damages. As to LCG, we remand for further factual findings on this issue as well.
 
 Third-Party Claim
 
 23
 As for defendants' third-party claim against Gates, Connecticut law generally does not permit contribution or indemnification among joint tortfeasors. See, e.g., Kaplan v. Merberg Wrecking Corp., 152 Conn. 405, 412, 207 A.2d 732, 736 (1965). One of the exceptions to that general rule, however, is
 
 
 24
 [w]here ... one of the defendants is in control of the situation and his negligence alone is the direct and immediate cause of the injury and the other defendant does not know of the fault, has no reason to anticipate it and may reasonably rely upon the former not to commit a wrong.
 
 
 25
 Kyrtatas v. Stop & Shop, Inc., 205 Conn. 694, 697-98, 535 A.2d 357, 358 (1988) (quoting Preferred Accident Ins. Co. v. Musante, Berman & Steinberg Co., 133 Conn. 536, 543, 52 A.2d 862 (1947)). In such circumstances, " 'it is only justice that the former should bear the burden of damages due to the injury.' " 205 Conn. at 698, 535 A.2d at 358.
 
 
 26
 The district court properly concluded that Gates' negligence alone was not the direct and immediate cause of plaintiffs' damages. For example, the Gates Report noted the need to construct a road in order to transport the coal from the mine, see slip op. at 26. Yet, Murphy failed to obtain a cost estimate for the road construction and to assess the impact of that cost on the project's economic feasibility, see id. at 26-27. In addition, the court found that Murphy knew of the Surface Mining Control and Reclamation Act of 1977 prior to closing of the deal and knew that this legislation was a " 'drastic change in the law' " which " 'revolutionized' " strip mining in the United States, see id. at 27 (citing Murphy deposition at 189-92). Yet, Murphy failed to disclose this information to plaintiffs, see id. Most important, it was the general partners, not Gates, who ultimately controlled the flow of information to the investors and who were responsible for determining what was communicated to them. Defendants claim that they were entitled to rely on the Gates Report because it was Gates' responsibility to determine the venture's economic feasibility. Nonetheless, the court indicated that Murphy, who was experienced in developing and mining coal properties, see id. at 6-7, should have known that the Gates Report was insufficient in critical respects, see id. at 40-41 & n. 5, and should have acted to ensure that the Report's conclusions were verified before he relied on them, see id. Indeed, even if we accepted defendants' assertion that assessing the project's feasibility was Gates' responsibility, we note that defendants failed to inform Gates of such crucial factors as the option agreement, id. at 26, and the royalty payments, id. at 23-24, which the court found were necessary to the determination of the project's economic feasibility, id. at 23. Thus, the district court correctly determined that Gates was not the direct and immediate cause of plaintiffs' injuries and should not be required to indemnify defendants.
 
 Damages
 
 27
 Finally, we amend the district court's award of damages to include recovery of payments made by plaintiffs after Murphy informed them in December 1978 of the project's troubles. Although Judge Dorsey correctly indicated that plaintiffs had a duty to mitigate damages, those plaintiffs who made payments after December 1978 pursuant to promissory notes secured by irrevocable, unconditional letters of credit could not mitigate their damages by withholding payment. Under Connecticut law, GCA would be entitled to collect on the irrevocable letters of credit in the event that plaintiffs defaulted, and plaintiffs would have been obligated to reimburse their banks, regardless of plaintiffs' defenses in a direct action by GCA. See Armac Industries, Ltd. v. Citytrust, 203 Conn. 394, 398-99, 525 A.2d 77, 79-80 (1987); New York Life Ins. Co. v. Hartford Nat'l Bank & Trust Co., 173 Conn. 492, 498-99, 378 A.2d 562, 566 (1977). Plaintiffs could not mitigate damages by defaulting on their promissory notes and thus are entitled to full recovery of their capital contributions.
 
 CONCLUSION
 
 28
 Based on the foregoing, we affirm in part, reverse in part and remand with instructions to enter judgment in favor of plaintiffs as to defendants Murphy and GCC on the section 12(2) and Sec. 36-498(a) claims, to make further factual findings with respect to defendant LCG, and to amend the determination of plaintiffs' damages.
 
 
 
 *
 Hon. William C. Conner, Senior United States District Judge, Southern District of New York, sitting by designation