Paul FINKEL, Paul Magnuson, Glenn Yarnis, Harvey Watkins, individually and as Representatives of all Persons similarly situated, Plaintiffs,

v.

The STRATTON CORPORATION, a Vermont Corporation; Moore & Munger, Inc., a Delaware Corporation; Stig Albertsson; Lovick Suddath; David A. Rosow; Sherman T. Van Esselstyn; Victor C. Braun, Jr.; Henry L. Levkoff; Wayne G. Granquist; Robert H. Kelso; Dowmar Securities, Inc., a New York Corporation, Defendants.

No. 88 Civ. 3779 (CSH).

United States District Court, S.D. New York.

Dec. 26, 1990.

As Amended Jan. 3, 1991.

Shanley & Fisher, P.C. (Charles A. Reid, III, Daniel M. Curzio, of counsel), New York City, for plaintiffs.

Cadwalader, Wickersham & Taft (Richard J. Weiner, Gregory S. Mertz, of counsel), New York City, for defendants The Stratton Corp., Moore & Munger, Inc. and the individual defendants.

Jeremy Dworkin, South Londonderry, Vt.

George Brooks, Montpelier, Vt.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

This purported class action alleges federal securities claims against corporations and individuals involved in the public sale of interests in a lodge and resort in Stratton, Vermont. Plaintiffs also assert related state statutory and common law claims. Certain defendants now move to dismiss the complaint under Rule 12(b)(6), Fed.R. Civ.P.

### Background

The complaint alleges the following:

Plaintiffs Paul Finkel and Paul Magnuson are residents of New Jersey. Plaintiffs Glenn Yarnis and Harvey Watkins are residents of New York. They each purchased units in Phase I at the Stratton Mountain Village Lodge ("The Lodge"). Defendant The Stratton Corporation ("Stratton" or "StratCorp") is a Vermont corporation maintaining its principal office in Stratton, Vermont. Defendant Moore & Munger, Inc. is a Delaware corporation with its principal office in Stamford, Connecticut and at the pertinent times was the

corporate parent and owner of all outstanding shares of Stratton. Defendant Dowmar Securities, Inc. ("Dowmar"), a New York corporation, is a registered securities broker/dealer. The individual defendants were at the pertinent times officers or directors of Stratton.

The purported class consists of purchasers of 91 units of The Lodge. The class is alleged to include more than 70 individuals who reside in at least nine states and at least one foreign country. Judging by the alleged state "Blue Sky" laws violations, members of the class reside in Vermont, Connecticut, Florida, Maryland, Massachusetts, Texas, and Virginia, in addition to New Jersey and New York.

On or after June 21, 1984, defendants or their agents delivered to plaintiffs and to the class members a Prospectus offering to sell to potential investors units in Phase I of The Lodge. The units were offered at initial prices ranging from $92,500 to $137,800. The Lodge was to be located at Stratton Mountain, Vermont, which defendants represented to be a winter and summer resort area including cluster houses and cooperatives, single family houses and lots, inns, a ski area, a golf course and other recreational facilities. The complex included 174 resort condominium lodge units, of which Phase I comprised 91 units and were offered for sale to the public by the Prospectus. The packages offered for sale consisted of the units themselves and a percentage of common elements, including a fee simple interest in the land upon which the units were to be situated, coupled with a required management agreement. Pursuant to that management agreement, Stratton as "Lodge Agent" would operate the units sold to investors as lodging accommodations through a contract with its affiliate, Stratton Restaurant and Lodging Corporation. The coupled package of lodge unit and management agreement constituted a security within the meaning of the federal securities laws.

Investors who purchased units deposited with Dowmar, the dealer/manger, a portion of a required 10% downpayment at the time they executed a non-binding unit subscription and management agreement. The terms of the offering provided that:

at any time until investors deposit the downpayment in full, investors may cancel the broker's instructions by a notice in writing without liability to Dealer/Manager or StratCorp, and upon such cancellation Dealer/Manager shall promptly return to the Investor all funds and documents deposited with Dealer/Manager on account of Investor's intended purchase. However, once Investor has deposited the downpayment in full and all 91 units in Phase I have been subscribed, all Investor cancellation rights terminate.

The final installment of the 10% purchase price downpayment was to be made within ten days after notice from the dealer/manager that all 91 units in Phase I were subscribed.

The complaint alleges that between the time of the issuance of the Prospectus and the date upon which investors would be asked to deliver the balance of the 10% downpayment, the defendants issued other written and oral communications to plaintiffs, the class members and other potential investors "with the intent that said individuals rely upon said communications in determining whether or not to purchase units in Phase I of the Lodge." Complaint, ¶ 32. Based upon the statements of the defendants contained in the Prospectus "and in other written and oral communications including those specified below, plaintiffs consummated purchases of units in Phase I." ¶ 33.

The Prospectus represented The Lodge was to be built in two phases, Phase I consisting of 91 units and Phase II consisting of an additional 83 units. The Prospectus further represented that The Lodge would be an integral part of a proposed "integrated and inter-related resort village" called Stratton Mountain Village which was to include 174 non-residential condominium lodge units of The Lodge and a conference center consisting of approximately 16,000 to 18,000 square feet. In addition to paraphrasing those representa-

tions, the complaint quotes the following language from the Prospectus:

StratCorp Management estimates that it will commence construction on the first major component within the proposed Stratton Mountain Village by April of 1984. In addition, it is planned that construction on the initial part of the main parking structure will begin at the same time. Construction on the other major components will be based upon the real estate market and the economy. The StratCorp Management estimates that the completion of all major components within the proposed village will occur over the next three to five years, but no assurance can be given.

  *  *  *  *  *  *

Though future development of facilities at Stratton Mountain is master planned or being planned for municipal approval, such future development is neither financed or approved by the appropriate public authorities, but neither StratCorp nor any of its affiliates make any representation or commitment as to the construction or availability of any recreational, commercial or other facilities at Stratton Mountain or Bromley Ski Area beyond those already in place or under construction, and purchase of a condominium security offered hereby should not be made in reliance on any facility not already in place or under construction at Stratton Mountain and Bromley. Registrant has no reason to believe that all necessary consents, permits and approvals will not be received. The foregoing is set forth herein not as a promise of future facilities but rather to inform a prospective Investor of StratCorp's plans and intentions.

*Lack of Meeting Facilities.* The Lodge will have no facilities for meeting or conference business until the Conference Center is built nearby. No assurance can be given that the conference center ever will be built and certainly, at present, financing for such center is not available. However, StratCorp will not commence the sale and construction of Phase II until assurance can be given

that the Conference Center will be completed at approximately the same time as Phrase II is completed. Group and Conference business is necessary in a resort to maintain and increase occupancies in off seasons when tourist business is low. Stratton Mountain Inn has certain meeting facilities and The Lodge may derive "overflow" business from the Inn, though no assurance can be given that this business will be significant. Laventhol & Horwath considered this lack of meeting and conference facilities in projecting occupancy and room rates in their market study of Phase I.

The Prospectus also contained a summary of a "Market Study with Financial Projections" dated March 23, 1984, prepared for Stratton by the accounting firm of Laventhol & Horwath. The Market Study was based in part on Stratton's representations that it "presently has plans for the further development of the mountain" which included "a conference center facility." The Market Study recited that its purpose was to determine the viability of the proposed Conference Center and Village Lodge Components of the proposed Stratton Mountain Village. The summary of the Market Study recites the conclusion of Laventhol & Horwath that: "On the basis of our study of the New England ski resort conference market, we believe there is sufficient demand to support the development of a conference center facility on Stratton Mountain in Stratton, Vermont." The study also set forth financial projections demonstrating the substantial impact of the conference center upon income and cash flow to investors in The Lodge.

The complaint alleges that the initial offering took place "in or about July of 1984." ¶ 38. Between that time and the time when investors were called upon to complete their 10% down payment (upon notification by Dowmar that all 91 units of Phase I had been sold), there was increasing uncertainty concerning the potential tax benefits of investments in The Lodge and the effect that proposed tax reform legislation might have. These factors caused concern to plaintiffs and the class members with respect to the economic via-

bility of their investment and in deciding whether to exercise their rights to cancel their investments and obtain a refund of all payments made.

On or about October 24, 1984 Dowmar mailed to plaintiffs and the other class members a letter which the complaint quotes in part:

> We are happy to announce that the First Phase of the Village Lodge Condominium–Hotel has been full subscribed. Sales began on the 91 unit hotel on the 22nd day of June and have now been completed.
>
> Per terms of the Purchase Agreement, the balance of the 10 percent downpayment requirement is now due and payable in full.
>
> \*      \*      \*      \*      \*      \*
>
> We have enclosed an account status form showing the amount you have paid to date and the balance due to complete your 10 percent escrow payment. Please return the W–9 Form for the bank along with your remittance within 10 days.
>
> For your perusal, we have enclosed the latest Stratton News Release to help keep you abreast of the many exciting events here at Stratton.

The complaint also quotes portions of the "Stratton News Release" forwarded with the Dowmar letter. It was dated October 11, 1984 and stated in part:

> STRATTON MOUNTAIN, VT.,—For years the thought of building a village at the base of Stratton seemed to be only a dream. Now, as construction of the first phase of the $60 Million complex nears completion, that dream has become a reality.
>
> Essentially the Village has four components—a residential area, a commercial center, a conference center and parking facility. And, with Stratton becoming the new home of the Volvo International Tennis Tournament, the Village will take on another exciting dimension—a new mountainside tennis stadium.
>
> The scope of this undertaking is greater than anything Stratton has ever done before, and, said Stratton President, Lovick Suddath, 'When each component of the Village is completed, few other resorts will have anything that will compare. And, we feel that the addition of the Volvo Tournament will enhance the Village even more.'
>
> Since ground was broken in June, work on the first stages of the Stratton Mountain Village has progressed quickly and preparations are already under way for the next phase of construction. When completed within three years, the new 22–Acre complex will enhance Stratton's position as one of the country's premiere year-round resorts.
>
> \*      \*      \*      \*      \*      \*
>
> *Future Plans*
>
> \*      \*      \*      \*      \*      \*
>
> Also scheduled next year is the completion of the Village's residential areas. During the summer of 1986 the Village Hall, a 500–person conference center will be added to help make Stratton one of New Englands top meeting and convention sites.

Plaintiffs and class members relied upon the statements contained in the Dowmar letter and the news release in deciding whether to complete their 10% downpayment or to exercise their right of cancellation. They characterize the statements quoted from those documents as containing "material information which removed uncertainties in the Prospectus concerning the intentions and plans of Stratton with respect to the development of the Conference Center and other facilities at Stratton Mountain." ¶ 40. The statements made by defendants in the Dowmar letter and the news release were knowingly false in that at the time they were made defendants did not plan to add a "village hall, a 500 person Conference Center in the summer of 1986;" nor did they expect Stratton to become a "top meeting and convention site;" the Stratton Mountain Village complex was not planned to be completed within three years as represented by defendants; and Stratton was not nor was it planned by defendants to be a "year-round resort." ¶ 41.

Class members also received the September, 1984 Stratton "Horizon," a newsletter

stating that defendants "have already booked business for 1986" in the Village Hall Conference Center. The May/June issue of the same newsletter stated that the conference center was scheduled for completion in 1987.

Turning again to the Prospectus, the complaint quotes this language:

> While the Investors have the opportunity to inspect the outline plans and specifications which are described herein, Investors will not have the opportunity to review the final plans and specifications or to inspect the Lodge prior to becoming bound to purchase Units. The outline plans and specifications contained in this Prospectus, however, contains sufficiently [sic] less detail than the final plans and specifications will contain. Accordingly Investors will be relying on Strat-Corp to construct and furnish a high quality resort Lodge....

In fact, Stratton did not construct "nor did it intend to construct" a "high quality resort lodge." The Lodge as constructed by Stratton fell substantially short of the quality expected in such an edifice, particularly in that it failed to supply the minimum standard of soundproofing required in such a Lodge and failed to supply adequate heating, ventilation and air conditioning. ¶ 44.

The Prospectus further represented that in an effort to mitigate and control potential conflicts of interest arising from the several functions of Stratton and its affiliates as operator or provider of rental services to other condominiums, cluster homes, cooperative units and chalets on Stratton Mountain competing with The Lodge for rental business, it had "established internal operating procedures to assure that the points of view of the various interests it represents will be recognized." The Prospectus further represented and acknowledged that Stratton, as Lodge agent, "owes a fiduciary duty to [investors] to manage the affairs of [investors] entrusted to Lodge agent to the best of its ability and in good faith." ¶¶ 45, 46 (quoting from the Prospectus). Contrary to those representations, Stratton never fulfilled its fiduciary duty to investors to manage their affairs to the best of its ability and in good faith and failed to take such steps as were necessary to mitigate and control potential conflicts of interest arising from Stratton's interests in other rental facilities on Stratton Mountain. In fact, Stratton's actions favored its other rental properties on Stratton Mountain over The Lodge.

The Laventhol & Horwath Market Study was based on the assumption that the Conference Center would be constructed by January 1, 1986, "when defendants knew that [the] Conference Center would not be opened by that date." ¶ 48.

The Prospectus was misleading in that it omitted to state the following material facts: Stratton had no present plan or intention of constructing a Conference Center; the construction by Stratton of the Conference Center was actually contingent upon many other factors besides the obtaining of financing and municipal approvals; Stratton did not intend to rely upon the conclusions of Laventhol & Horwath with respect to the economic viability and profitability of the Conference Center as set forth in the market study; the construction of a conference center would require additional investment by plaintiffs and class members; and Stratton had virtually no experience in the management of retail hotel properties. ¶ 49.

The plaintiffs and class members relied upon defendants' representations. They would not have purchased units in Phase I had defendants disclosed the true facts. "Prior to June 13, 1987," ¶ 52, plaintiffs and class members had not discovered, nor could they have discovered by the exercise of reasonable diligence, that defendants had made untrue statements of fact and material omissions in connection with the "site of the Lodge units." ¶ 52. That allegation is followed by the concluding factual allegation in the complaint, which says:

> Defendants have continuously and fraudulently concealed that they made untrue statements of fact and material omissions in connection with the sale of the Lodge Units by a series of misleading oral and written communications with respect to the matters alleged above includ-

ing, but not limited to a continuing series of statements designed to cause plaintiffs and the class members to believe that the Conference Center would be built. These representations continued through the June 13, 1987 meeting of Lodge members. ¶ 53.

On the basis of these allegations, plaintiffs allege against all defendants fraud in violation of § 10(b) of the Securities Exchange Act of 1934 (Count I); fraud in violation of 17(a)(2) of the Securities Act of 1933 (Count II); offering and selling securities by means of untrue statements in violation of § 12(2) of the 1933 Act (Count III); offering and selling securities on the basis of untrue statements in violation of § 11 of the 1933 Act (Count IV); a civil RICO claim under 18 U.S.C. § 1964(c) (Count V); fraud in violation of various state "Blue Sky" laws (Count VI); common law fraud (Count VII); and negligent misrepresentation (Count VIII).

All defendants except Dowmar move to dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Defendants assert that none of the alleged misstatements and omissions constitute material facts, so that all counts must be dismissed; that no private right of action is available under § 17 of the 1933 Act; that plaintiffs' claims under §§ 11 and 12(2) are time barred and do not allege misstatements and omissions falling within the statute; that the claims under § 10(b) of the 1934 Act are time barred, and do not allege loss causation; that the complaint does not allege the existence of a RICO enterprise; that the fraud claims are not pleaded with requisite specificity; that the pendent state law and common law claims should be dismissed for want of a viable federal claim, and that the state "blue sky" law claims are not viable in any event; and that if any claims are dismissed with leave to replead, plaintiffs should be required to post an undertaking for payment of defendants fees' and costs.

Plaintiffs respond that their complaint is sufficient and timely; ask leave to replead if any portion of it is dismissed; and resist the application for an undertaking for costs.

## Discussion

Before considering the sufficiency of the pleading and plaitniffs' request to replead if necessary, I deal with those assertions by defendants which if sound require dismissal of a particular claim in any event. *The Claim under § 17(a) of the 1933 Act.*

In *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), the Second Circuit held that a private cause of action is available under § 17(a). The Second Circuit reasoned in *Kirshner* that § 17(a) was essentially identical to § 10(b) of the 1934 Act, where a private cause of action was implied. 603 F.2d at 241. However, as the Second Circuit recently recognized in *Wexner v. First Manhattan Co.*, 902 F.2d 169, 173 (2d Cir. 1990), that determination "has been severely, and perhaps fatally, undercut by the Supreme Court's ruling to the contrary in *Aaron v. SEC*, 446 U.S. 680 [100 S.Ct. 1945, 64 L.Ed.2d 611] (1980)."

As *Wexner* goes on to observe, the reasoning of *Kirshner* has been questioned by subsequent Second Circuit opinions, *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 559 n. 3 (2d Cir.1985); *Zerman v. Ball*, 735 F.2d 15, 23 (2d Cir. 1984) has been criticized by legal scholars; and a number of district courts of the circuit have concluded, notwithstanding *Kirshner*, that no private cause of action can be implied from § 17(a) *See* district court cases collected at 902 F.2d 174. While leaving the question open, the *Wexner* court said at 174: "It is apparent that the vitality of our holding in *Kirshner* is in doubt, and the existence of a private right of action under § 17(a) is in need of re-examination."

■ This Court has previously held that § 17(a) confers no private cause of action. *Ackerman v. Clinical Data, Inc.*, No. 84 Civ. 5400, 1985 WL 1884 (S.D.N.Y.1985). The Second Circuit cited *Ackerman* among the district court opinions collected at 902 F.2d 174. Given the Second Circuit's re-

cent questioning of *Kirschner's* vitality, I see no basis for departing from the conclusion I reached in *Ackerman.*

Count II of the complaint will be dismissed without leave to replead.

*Claims under §§ 11 and 12(2) of the 1933 Act.*

Defendants assert that plaintiffs have not sufficiently pleaded the timeliness of §§ 11 and 12(2) claims, and that those claims are time barred in any event.

These claims are governed by the statute of limitations contained in § 13 of the 1933 Act, which provides:

No action shall be maintained to enforce any liability created under section [11] or [12(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created under section [11] or [12(1)] of this title more than three years after the security was bona fide offered to the public, or under section [12(2)] of this title more than three years after the sale.

■ Plaintiffs must affirmatively plead compliance with § 13. Earlier caselaw, construing § 12(2) claims as sounding in fraud, required plaintiffs to allege (1) the time and circumstances of the discovery of the fraudulent statement or statements underlying the claims; (2) the reasons why the fraud was not discovered earlier (if more than one year has passed); and (3) the diligent efforts plaintiffs undertook in making or seeking such discovery. *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 662 (S.D.N.Y.1987) and cases cited. But more recent authority takes § 12(2) claims outside fraud. Viewing these defendants as statutory sellers, *see Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), they "may now be liable under Section 12 whether or not scienter or loss causation is shown." *Wilson v. Saintine Exploration and Drilling Corp.,* 872 F.2d 1124, 1126 (2d Cir.1989) (applying *Pinter* rationale to a § 12(2) claim). *See also Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir.1988) (under § 12(2), sellers' "material misrepresentations and omissions render them strictly liable to plaintiffs."). However, the limitations periods remain the same.

■ Although *Pinter* and its progeny shift the gravamen of a § 12(2) claim from fraud to strict liability, the fact remains that plaintiffs at bar allege fradulent misrepresentations and ommisions in their effort to satisfy the statute of limitations. Complaint, ¶ 53. Therefore the allegations must comply with Rule 9(b). They do not. The complaint's allegations in ¶¶ 52 and 53 in respect of timeliness are wholly conclusory. Moreover, they depend upon allegations of fraud which are devoid of Rule 9(b) specificity. *See* discussions of § 10(b) claim, *infra.* More than one year elapsed between the issuance of the identified 1984 documents and the filing of suit. Plaintiffs cannot comply with § 13 pleading requirements by offering allegations insufficient under Rule 9(b). The complaint is subject to dismissal for failure to plead compliance with § 13's one year rule.

In the alternative, defendants argue that § 13 bars the §§ 11 and 12(2) claims in any event because suit was filed more than three years after the security "was bona fide offered to the public" (the § 11 claim) and "more than three years after the sale" (§ 12(2) claim).

Determination of these issues depends upon analysis of the events which trigger the § 13 three-year limitation period.

■ § 13 requires that a § 11 claim be sued upon within three years of the time that a security is "bona fide offered to the public." In the case at bar, the original June 25, 1984 Prospectus offered the securities to the public. The Prospectus formed a part of the registration statement which became effective on June 21, 1984. In ¶ 31 of their complaint, plaintiffs specifically allege that "on or after June 21, 1984" defendants delivered to each plaintiff and class member "a Prospectus wherein defendants offered to sell to plaintiffs, the class members and other potential investors units in Phase I of The Lodge." If

that Prospectus constituted a bona fide offer to the public, the § 13 three-year limitations period bars plaintiffs' § 11 claim, the complaint having been filed more than three years later.

■ In *Morse v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 619, 621–24 (S.D.N.Y.1977), Judge Conner decided after careful analysis of § 11 "to treat the 'bona fide' offering date of a registered security as the date upon which the security actually becomes available to the public for purchase and sale, i.e., the effective date of the registration statement." Under that holding the present plaintiffs' § 11 claim is time barred. Plaintiffs cite no authority to the contrary. I adopt Judge Conner's reasoning and conclude that plaintiffs' § 11 claim is time barred under the three-year limitations period. That renders academic possible repleading of the complaint in an effort to satisfy the one-year period.

■ Plaintiffs seek to avoid this result by referring in their motion papers to a "Supplemental Prospectus" dated July 17, 1985, which they contend triggers S.E.C. Regulation S–K Item 512(a)(2), 17 C.F.R. § 220.512(a)(2). That regulation provides:

That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

Plaintiffs contend that the Supplemental Prospectus and the Regulation make the effective date of the offering July, 1985.

I do not agree. The complaint nowhere quotes or incorporates the Supplemental Prospectus by reference. More significantly, the regulation by its own terms applies only to a post-effective amendment's relationship to "the securities offered therein;" the offering "of such securities" [i.e., offered in the amendment] "at that time" [i.e. the date of the amendment] shall be deemed to be "the initial bona fide offering thereof" [i.e., of such securities]. There is no suggestion, even in plaintiffs' motion papers, that the Supplemental Prospectus

constituted an offering of securities "at that time."

■ A § 12(2) claim must be sued upon no more than three years after the sale of the securities in question. It is common ground that when plaintiffs paid the balance of their 10% downpayments, their subscription agreements became non-cancellable. It also appears to be undisputed that those balances were paid more than three years before institution of suit. Plaintiffs argue that the "sale" did not occur until June 25, 1985, when the Lodge units were delivered to the plaintiffs. They argue in support of that contention that while the Prospectus made the sale non-cancellable by investors after payment of the 10% downpayment, it "also provided that the sale could be cancelled by the defendants based on certain financial contingencies, namely—the failure of an investor to obtain the appropriate financing." Plaintiff's Brief at 32. Plaintiffs argue that the sale cannot be deemed "final" when the seller "retains the option to cancel the sale."

I disagree. Within the context of § 12(2), I conclude that a "sale" occurs when the investor/purchaser becomes irrevocably bound to the transaction. In *Amoroso v. Southwestern Drilling Multi–Rig*, 646 F.Supp. 141, 144 (N.D.Cal.1986), comparably situated plaintiffs argued that so long as the transaction remained contingent on certain conditions, there was no "sale." The district court rejected that argument, holding that *"each purchaser* entered an irrevocable commitment as soon as he signed the Subscription Page. Only *Southwestern Drilling—the seller—*remained free to withdraw." (emphasis in original). The court then held:

[E]ach investor's limited partnership interest was "sold" on the date that Southwestern Drilling accepted his subscription. Once an investor had offered to subscribe, the Southwestern Drilling had accepted his subscription, the contract was completely formed. *Id.* at 145.

I agree with that reasoning. Plaintiffs cite no pertinent contrary authority. Accordingly their § 12(2) claim is also time

barred under the § 13 three-year limitations period. Again, there is no need to consider whether the complaint could be repleaded to satisfy the one-year period.

Having concluded that these claims are time barred, I need not reach defendants' further assertion that the alleged misstatements and omissions do not fall within the statute.

Counts III and IV of the complaint will be dismissed without leave to replead.

### Claims under § 10(b) of the 1934 Act.

Plaintiffs' § 10(b) claims sounds entirely in fraud. Defendants assert a number of bases for dismissal of this claim. I will first consider whether fraud is alleged with the specificity Rule 9(b) requires, and the question of time bar. As will be seen, these issues are closely interrelated.

On this motion to dismiss, I consider only the allegations of the complaint, including the quotations from the documents referred to in those allegations. "On a motion to dismiss, the district court must limit itself to a consideration of the facts alleged on the face of the complaint, ... and to any documents attached as exhibits or incorporated by reference," *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989). That permits consideration of the initial Prospectus, the Dowmar letter, and the several Stratton news releases quoted in the complaint. I disregard on this motion the Supplemental Prospectus, apparently subsequently issued and discussed by the parties in their briefs. That document is nowhere referred to on this motion in the complaint and is not before me for purposes of the present analysis.

In considering the sufficiency of the complaint measured by Rule 9(b), it is useful to review the controlling principles.

Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) must be read together with Rule 8(a) which requires only a "short and plain statement of the claims for relief." *Ouaknine v.*

*MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990); *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). On a motion to dismiss, the court assumes the truth of plaintiff's factual allegations, *Ouaknine* at 78, reads the complaint generously, and draws all inferences in favor of the pleader. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 562 (2d Cir.1985). But Rule 9(b) must be enforced so as to accomplish its three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of his defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits. *DiVittorio* at 1247.

■ To satisfy the particularity requirement of Rule 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. *Cosmas* at 11. Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. *DiVittorio* at 1247. However, no specific connection between fraudulent representations or omissions need be pleaded as to defendants who are insiders or affiliates personally participating in the statements at issue. *DiVittorio* at 1247 (offering memorandum); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986) (same).

■ A complaint may adequately identify the statements alleged to be misrepresentations and properly indicate when, where and by whom they were made, yet still fail Rule 9(b) scrutiny if the complaint does not allege circumstances giving rise to a strong inference that defendant knew the statements to be false, *Wexner v. First Manhattan Co.*, 902 F.2d 169, 173 (2d Cir. 1990), and intended to defraud plaintiff, *Ouaknine* at 80; *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d

Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

Knowledge is a state of mind. So is intent to defraud, or "scienter." While Rule 9(b) permits conditions of mind to be averred generally, the rule also requires that allegations of scienter be supported by facts giving rise to a "strong inference" of fraudulent intent. *Ouaknine* at 80; *Beck* at 50; *Connecticut National Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987).

Allegations supporting an inference of fraudulent intent frequently include defendant's statement that a fact exists or an event will come to pass coupled with allegations that the fact did not exist or the event did not occur, and circumstances indicating that the statement was false when made. *See, e.g., Luce* at 56 (alleged misrepresentation in offering memorandum that general partners would make an initial capital contribution of $385,000 and guarantee a $4.5 million construction loan accompanied by allegations that general partners contributed only $80,000 and did not guarantee the loan); *DiVittorio* at 1248 (offering memorandum's statement that proceeds of offering would be expended as quickly as possible accompanied by allegation that proceeds were never so applied, and estimate that property contained approximately 9,260,000 tons of coal accompanied by allegation that mines did not contain nearly that much). *See Ouaknine* at 81 for a comparable analysis.

To satisfy the scienter requirement, a plaintiff need not allege facts which show a defendant had a motive for committing fraud, so long as plaintiff adequately identifies circumstances indicating "conscious behavior" by the defendant from which an intent to defraud may fairly be inferred. *Cosmas* at 13. However, where a particular defendant's motive to defraud is not apparent, the strength of the circumstantial allegations must be correspondingly greater. *Beck* at 50.

Allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge. *Luce* at 54 n 1.; *DiVittorio* at 1247–48. However, that exception to Rule 9(b)'s general requirement of particularized pleading does not constitute a license to base claims of fraud on speculation or conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy a relaxed pleading standard. *Wexner* at 172.

The complaint at bar adequately identifies the documents upon which the claims of fraud are based, and the alleged misrepresentations and fraudulent omissions contained therein. Furthermore, since the moving defendants are the corporate entities directly involved in the venture or Stratton officers and directors, no specific connection between fraudulent representations or omissions in those documents and particular defendants is necessary. *Luce* at 805.

The gravamen of plaintiffs' fraud claims is that when the defendants stated their expectations or intentions with respect to the Stratton Mountain project, they did not hold the represented expectations, and had no intention of acting as they said they would. Plaintiffs' allegations are conceptually adequate to state claims for fraud, since "[m]aking a specific promise to perform a particular act in the future while secretly intending not to perform may violate Section 10(b) ... if the promise is part of the consideration for a sale of securities." *Pross v. Katz*, 784 F.2d 455, 457 (2d Cir.1986). The latter element is satisfied by plaintiff's allegations that they relied upon defendants' statements of expectation and intent in making their investment decisions. Accordingly I reject defendants' first argument that none of the alleged misstatements and omissions constitutes material facts.

But the complaint fails to pass Rule 9(b) muster in its allegations of defendants' knowledge of falsity and scienter. Here the allegations are entirely conclusory. In essence, they proceed from the proposition that since certain future acts did not come to pass, defendants never intended to accomplish them, and fraudu-

**330**

lently concealed that state of mind from investors when preparing the Prospectus and the subsequent documents. Such bald and conclusory allegations are insufficient in law. They must be accompanied with specific allegations of fact giving rise to a strong inference of fraud. The complaint contains no such allegations.

Plaintiffs' references in a paragraph such as ¶ 53 of the complaint to "a series of misleading oral and written communications" which "continued through the June 13, 1987 meeting of Lodge members" is entitled to no consideration because there is a total absence of specificity. Plaintiffs do not say what such oral or written representations consisted of, who made them, when they were made and to whom, and the manner in which they were false.

Placing such allegations to the side, I am concerned only with those particular statements which are sufficiently identified in the complaint. But they do not satisfy the rule because the complaint does not adequately allege circumstances from which defendants' knowledge of falsity and intent to defraud may be inferred.

■ Defendants also contend that plaintiffs' § 10(b) claim fails to allege loss causation. I agree. A viable § 10(b) claim must allege both transaction causation and loss causation. The complaint alleges in essence that if defendants had not said the things they said and had said what they omitted, plaintiffs would not have invested. This is "but for" or loss transaction pleading, which by itself is insufficient. Plaintiffs must also allege that the specified misrepresentations and omissions "proximately relate to the alleged reasons for the investors' losses." *In re Gas Reclamation, Inc. Securities Litigation*, 733 F.Supp. 713, 722 (S.D.N.Y.1990). That is loss causation. Defendants argue in their brief that "the defendants' misrepresentations regarding the building of a first class resort with a conference center facility is the primary reason why the Lodge units purchased by plaintiffs are today substantially unmarketable." Plaintiffs' Brief at 42. Defendants cite ¶¶ 51 and 56 for that proposition. ¶ 56 does no more than gener-

ally allege fraud in language tracking the statute. ¶ 51 alleges:

> Had defendants disclosed the true facts to the plaintiffs and the class members, they would not have purchased units in Phase I of the Lodge which, in light of the true facts, are today substantially unmarketable.

The first part of this sentence relates only to transaction causation. The last phrase arguably pleads loss causation, but is not sufficient given other plausible explanations for the investors' ultimate disappointment, such as changes in the tax laws and a downturn in the real estate market. Where "there is a genuine dispute as to the reasons for the failure" of a project, *In re Gas Reclamation, Inc. Securities Litigation*, at 722, a plaintiff must allege loss transaction with greater particularity; and those allegations must appear in the complaint, subject to Rule 11 scrutiny. It will not do to advance such theories in a brief.

I turn to the timeliness of the 10(b) claim.

■ Since § 10(b) of the 1934 Act did not expressly grant a private right of action, which has instead been implied by the courts, the Act contains no controlling statute of limitations for a § 10(b) claim. In those circumstances, the Second Circuit and other circuits have held that the statute of limitations should be adopted by reference to the pertinent laws of the forum state. Under that rule this Court looked to New York law, particularly the borrowing rules found in N.Y. CPLR § 202. The Second Circuit, applying that statute to a § 10(b) action, has held that the cause of action accrues where its economic impact is felt, normally the plaintiff's residence. Thus if a suit brought in the place of plaintiff's residence would be time-barred, the suit in a New York federal court was time-barred. *See Ceres Partners v. GEL Associates*, 918 F.2d 349, 350–353 (2d Cir.1990).

*Ceres* changes the statute of limitations applicable to § 10(b) claims. In that case the Second Circuit expressed its agreement with the Third Circuit's decision in *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3rd Cir.) (*en banc*),

*cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), which declared a uniform federal statute of limitations requiring that a § 10(b) suit be brought "one year after the plaintiff discovers the violation, and in no event more than three years after such violation." 843 F.2d at 1550. In *Ceres* the Second Circuit adopted the same rule. 918 F.2d at 364.

The *Ceres* court did not need to decide the question of retroactive application of its ruling because the plaintiff's claim would have been time barred under both its newly announced federal period of limitations and the prior Second Circuit rule, which looked to New York law. The plaintiff in *Ceres* resided in New Jersey. The Second Circuit concluded that under New York choice of law, New Jersey law furnished the controlling statute of limitations. Since § 27 of the 1934 Act grants the federal district courts exclusive jurisdiction to enforce its provisions, the district court in New Jersey would be bound to follow the ruling of the Third Circuit in *Data Access. Ceres,* 918 F.2d at 353. Plaintiff's claim was barred because it conceded "that it cannot meet the one-year/three-year test." *Id.* at 353.

Under *Ceres,* the federal one-year/three-year period applies to plaintiffs Finkel and Magnuson, who reside in New Jersey. No question of retroactivity arises because the Third Circuit decided *Data Access* on April 8, 1988 (*en banc* decision) and plaintiffs at bar filed their complaint on June 1, 1988.

Accordingly Finkel's and Magnuson's § 10(b) claims are barred unless they can satisfy the one-year/three-year limitations period.

The *Ceres* plaintiff's claim was time barred since acknowledged acquisition of the pertinent information more than one year prior to the institution of suit. 918 F.2d at 356. Plaintiffs at bar make no such concession. They contend that the fraud continued, concealed by the defendants, and could not have been discovered by plaintiffs by the exercise of reasonable diligence "until the meeting of Lodge members on June 23, 1987." Plaintiffs' Brief at 40. The complaint alleges at ¶ 53 that "a series of misleading oral and written com-

munications" continued "through the June 13, 1987 meeting of Lodge members," although the complaint does not specify what occurred at that meeting or how it came about that plaintiffs were for the first time made aware of the fraud of which they now complain or put on notice of its possibility.

██ The problem with the complaint is that plaintiffs' allegations that they had not and could not have discovered defendants' misrepresentations and material omissions until the June 13, 1987 meeting of the Lodge members (whatever that was) is entirely conclusory; and the allegation of a "series of misleading oral and written communications" pleaded in support of that conclusion fails to comply with Rule 9(b). These communications are alleged to include "a continuing series of statements designed to cause plaintiffs and the class members to believe that the Conference Center would be built." But no specifics are furnished, as the rule requires. These particular paragraphs of the complaint must be disregarded as a pleading nullity. That being so, they cannot form the basis for an argument that plaintiffs complied with the one-year rule.

The three-year rule requires that a § 10(b) claim be sued upon in no event more than three years after the violation. Disregarding the more recent oral and written statements just referred to as insufficiently pleaded, we are left with the October 1984 Dowmar letter and Stratton News Release. Plaintiffs specifically allege these documents to have contained false and fraudulent reassurances. But a complaint filed on June 1, 1988 is not timely under the three-year rule, measured from 1984; and the allegations in ¶¶ 52 and 53 are equally inadequate as a vehicle for bringing the complaint within the statute. The New Jersey plaintiffs' § 10(b) claim as presently pleaded is time-barred.

As for the New York plaintiffs, the Second Circuit rule in effect at the time plaintiffs filed their complaint looked to New York substantive law. The New York Statute of limitations for actions based on fraud is six years, N.Y. CPLR § 213(8), and

so their claims were timely filed unless *Ceres* should be applied retroactively, a question the Second Circuit left open.

Defendants argue for retroactive application and say that the Third Circuit has applied *Data Access* retroactively, citing *Hill v. Equitable Trust Co.*, 851 F.2d 691 (3d Cir.1988). The Third Circuit in *Hill* looked to *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971), for the qualifications making a decision prospective only. Those qualifications are:

(1) The holding must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed;

(2) The merits and demerits in each case must be weighed by looking to the history of the rule in dispute, its purpose and effect, and whether retrospective operation will further or retard the rule's operation;

(3) Retrospective application must create the risk of producing substantially inequitable results.

In *Hill* the Third Circuit applied *Data Access* retroactively because, on the particular facts of the case, the federal limitations period adopted in *Data Access* was identical to the state statutory provisions adopted by the district court under the prior rule. "Thus, plaintiffs fare the same whether our new *Data Access* holding or the Maryland statute applies." 851 F.2d at 698.

The situation is entirely different with respect to the New York plaintiffs at bar. Under the New York statute and the Second Circuit rule in existence at the time of filing, their § 10(b) claim was timely. It would be inequitable to apply *Ceres* retroactively so as to transform an action timely when filed into one barred forever by the statute of limitations. Accordingly the New York plaintiffs' 10(b) claim is not barred by the statute of limitations.

In sum, the complaint fails to allege a viable § 10(b) claim because it does not comply with Rule 9(b) and loss causation is not adequately alleged. As to the New Jersey plaintiffs, the timeliness of the action is problematical given the inadequacies of the pleading.

I grant plaintiffs leave to replead the § 10(b) claim, and deny defendants' request that plaintiffs be required to post security. In framing an amended complaint, plaintiffs and counsel should keep Rule 11 in mind.

*The Other Claims.*

I need not consider the civil RICO claim unless plaintiffs can adequately allege fraud. Since the RICO predicate acts arise out of fraud, Rule 9(b) criteria applied with equal force, and the RICO claim is inadequately pleaded. *See Beck* at 49; *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 18–19 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). I reach no other RICO question.

As for the state and common law claims, plaintiffs allege no independent basis for subject matter jurisdiction. Accordingly I will dismiss those claims if plaintiffs cannot allege a viable federal claim.

### Conclusion

For the foregoing reasons, Counts II, III and IV of the complaint are dismissed without leave to replead. Counts I, V, VI, VII and VIII are dismissed with leave to replead within thirty (30) days of the date of this Opinion.

It is SO ORDERED.